## WILLIAMS ET AL. *v.* NORTH CAROLINA.

No. 29. Argued October 20, 1942.—Decided December 21, 1942.

288

*Mr. W. H. Strickland* for petitioners.

*Mr. Hughes J. Rhodes,* Assistant Attorney General of North Carolina, with whom *Messrs. Harry McMullan,* Attorney General, and *M. B. Gillam, Jr.* were on the brief, for respondent.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Petitioners were tried and convicted of bigamous cohabitation under § 4342 of the North Carolina Code,[1] 1939, and each was sentenced for a term of years to a state prison. The judgment of conviction was affirmed by the Supreme Court of North Carolina. 220 N. C. 445, 17 S. E. 2d 769. The case is here on certiorari.

Petitioner Williams was married to Carrie Wyke in 1916 in North Carolina and lived with her there until May, 1940. Petitioner Hendrix was married to Thomas Hendrix in 1920 in North Carolina and lived with him there until May, 1940. At that time petitioners went to Las Vegas, Nevada, and on June 26, 1940, each filed a divorce action in the Nevada court. The defendants in those divorce actions entered no appearance nor were they served with process in Nevada. In the case of defendant Thomas Hendrix, service by publication was had by publication of the summons in a Las Vegas newspaper and by mailing a copy of the summons and complaint to his last post-office address.[2] In the case of defendant Carrie Wil-

---

[1] Sec. 4342 provides in part: "If any person, being married, shall contract a marriage with any other person outside of this state, which marriage would be punishable as bigamous if contracted within this state, and shall thereafter cohabit with such person in this state, he shall be guilty of a felony and shall be punished as in cases of bigamy. Nothing contained in this section shall extend . . . to any person who at the time of such second marriage shall have been lawfully divorced from the bond of the first marriage . . ."

[2] Defendant Hendrix had written his wife's Nevada attorney, "Upon receipt of the original appearance, I will sign the same." But no ap-

liams, a North Carolina sheriff delivered to her in North Carolina a copy of the summons and complaint. A decree of divorce was granted petitioner Williams by the Nevada court on August 26, 1940, on the ground of extreme cruelty, the court finding that "the plaintiff has been and now is a *bona fide* and continuous resident of the County of Clark, State of Nevada, and had been such resident for more than six weeks immediately preceding the commencement of this action in the manner prescribed by law." [3] The Nevada court granted petitioner Hendrix a divorce on October 4, 1940, on the grounds of wilful neglect and extreme cruelty, and made the same finding as to this petitioner's *bona fide* residence in Nevada as it made in the case of Williams. Petitioners were married to each other in Nevada on October 4, 1940. Thereafter they returned to North Carolina where they lived together until the indictment was returned. Petitioners pleaded not guilty and offered in evidence exemplified copies of the Nevada proceedings, contending that the divorce decrees and the Nevada marriage were valid in North Carolina as well as in Nevada. The State contended that since neither of the defendants in the Nevada actions was served in Nevada nor entered an appearance there, the Nevada decrees would not be recognized as valid in North Carolina. On this issue the court charged the jury in substance that

---

pearance was entered and the North Carolina court charged the jury that a promise to make an appearance does not constitute one.

[3] Sec. 9460, Nev. Comp. L. 1929, as amended L. 1931, p. 161, provides in part: "Divorce from the bonds of matrimony may be obtained by complaint, under oath, to the district court of any county in which the cause therefor shall have accrued, or in which the defendant shall reside or be found, or in which the plaintiff shall reside, or in which the parties last cohabited, or if plaintiff shall have resided six weeks in the state before suit be brought, for the following causes, or any other causes provided by law . . ." Sec. 9467.02 provides that "In all civil cases where the jurisdiction of the court depends upon the residence of one of the parties to the action, the court shall require corroboration of the evidence of such residence." L. 1931, p. 277.

a Nevada divorce decree based on substituted service where the defendant made no appearance would not be recognized in North Carolina, under the rule of *Pridgen* v. *Pridgen*, 203 N. C. 533, 166 S. E. 591. The State further contended that petitioners went to Nevada not to establish a *bona fide* residence but solely for the purpose of taking advantage of the laws of that State to obtain a divorce through fraud upon that court. On that issue the court charged the jury that, under the rule of *State* v. *Herron*, 175 N. C. 754, 94 S. E. 698, the defendants had the burden of satisfying the jury, but not beyond a reasonable doubt, of the *bona fides* of their residence in Nevada for the required time. Petitioners excepted to these charges. The Supreme Court of North Carolina in affirming the judgment held that North Carolina was not required to recognize the Nevada decrees under the full faith and credit clause of the Constitution (Art. IV, § 1) by reason of *Haddock* v. *Haddock*, 201 U. S. 562. The intimation in the majority opinion (220 N. C. pp. 460–464) that the Nevada divorces were collusive suggests that the second theory on which the State tried the case may have been an alternative ground for the decision below, adequate to sustain the judgment under the rule of *Bell* v. *Bell*, 181 U. S. 175—a case in which this Court held that a decree of divorce was not entitled to full faith and credit when it had been granted on constructive service by the courts of a state in which neither spouse was domiciled. But there are two reasons why we do not reach that issue in this case. In the first place, North Carolina does not seek to sustain the judgment below on that ground. Moreover it admits that there probably is enough evidence in the record to require that petitioners be considered "to have been actually domiciled in Nevada." In the second place, the verdict against petitioners was a general one. Hence, even though the doctrine of *Bell* v. *Bell, supra,* were to be deemed applicable here, we cannot determine on this rec-

ord that petitioners were not convicted on the other theory on which the case was tried and submitted, *viz.* the invalidity of the Nevada decrees because of Nevada's lack of jurisdiction over the defendants in the divorce suits. That is to say, the verdict of the jury for all we know may have been rendered on that ground alone, since it did not specify the basis on which it rested. It therefore follows here as in *Stromberg* v. *California,* 283 U. S. 359, 368, that if one of the grounds for conviction is invalid under the Federal Constitution, the judgment cannot be sustained. No reason has been suggested why the rule of the *Stromberg* case is inapplicable here. Nor has any reason been advanced why the rule of the *Stromberg* case is not both appropriate and necessary for the protection of rights of the accused. To say that a general verdict of guilty should be upheld though we cannot know that it did not rest on the invalid constitutional ground on which the case was submitted to the jury, would be to countenance a procedure which would cause a serious impairment of constitutional rights. Accordingly, we cannot avoid meeting the *Haddock* v. *Haddock* issue in this case by saying that the petitioners acquired no *bona fide* domicil in Nevada. If the case had been tried and submitted on that issue only, we would have quite a different problem, as *Bell* v. *Bell* indicates. We have no occasion to meet that issue now and we intimate no opinion on it. However it might be resolved in another proceeding, we cannot evade the constitutional issue in this case on the easy assumption that petitioners' domicil in Nevada was a sham and a fraud. Rather, we must treat the present case for the purpose of the limited issue before us precisely the same as if petitioners had resided in Nevada for a term of years and had long ago acquired a permanent abode there. In other words, we would reach the question whether North Carolina could refuse to recognize the Nevada decrees because, in its view and contrary to

the findings of the Nevada court, petitioners had no actual, *bona fide* domicil in Nevada, if and only if we concluded that *Haddock* v. *Haddock* was correctly decided. But we do not think it was.

The *Haddock* case involved a suit for separation and alimony, brought in New York by the wife on personal service of the husband. The husband pleaded in defense a divorce decree obtained by him in Connecticut where he had established a separate domicil. This Court held that New York, the matrimonial domicil where the wife still resided, need not give full faith and credit to the Connecticut decree, since it was obtained by the husband who wrongfully left his wife in the matrimonial domicil, service on her having been obtained by publication and she not having entered an appearance in the action. But we do not agree with the theory of the *Haddock* case that, so far as the marital status of the parties is concerned,[4] a decree of divorce granted under such circumstances by one state need not be given full faith and credit in another.

Article IV, § 1 of the Constitution not only directs that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State" but also provides that "Congress may by general laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof." Congress has exercised that power. By the Act of May 26, 1790, c. 11, 28 U. S. C. 687, Congress has provided that judgments "shall have such faith and credit given to them in every court within the United States as they have by law or usage in the courts of the State from which they are taken." Chief Justice Marshall stated in *Hampton* v. *M'Connel,* 3 Wheat. 234, 235, that "the judgment of a state court should have the same credit,

---

[4] Thus we have here no question as to extraterritorial effect of a divorce decree insofar as it affects property in another State. See the cases cited, *infra,* note 5.

validity, and effect, in every other court in the United States, which it had in the state where it was pronounced, and that whatever pleas would be good to a suit thereon in such state, and none others, could be pleaded in any other court in the United States." That view has survived substantially intact. *Fauntleroy* v. *Lum,* 210 U. S. 230. This Court only recently stated that Art. IV, § 1 and the Act of May 26, 1790 require that "not some, but full" faith and credit be given judgments of a state court. *Davis* v. *Davis,* 305 U. S. 32, 40. Thus, even though the cause of action could not be entertained in the state of the forum, either because it had been barred by the local statute of limitations or contravened local policy, the judgment thereon obtained in a sister state is entitled to full faith and credit. See *Christmas* v. *Russell,* 5 Wall. 290; *Fauntleroy* v. *Lum, supra; Kenney* v. *Supreme Lodge,* 252 U. S. 411; *Titus* v. *Wallick,* 306 U. S. 282, 291. Some exceptions have been engrafted on the rule laid down by Chief Justice Marshall. But as stated by Mr. Justice Brandeis in *Broderick* v. *Rosner,* 294 U. S. 629, 642, "the room left for the play of conflicting policies is a narrow one." So far as *judgments* are concerned, the decisions,[5] as distinguished from dicta,[6] show that the

---

[5] *Fall* v. *Eastin,* 215 U. S. 1; *Olmsted* v. *Olmsted,* 216 U. S. 386; *Hood* v. *McGehee,* 237 U. S. 611. These decisions refuse to require courts of one state to allow acts or judgments of another to control the disposition or devolution of realty in the former. They seem to rest on the doctrine that the state where the land is located is "sole mistress" of its rules of real property. See *Hood* v. *McGehee, supra,* p. 615; and the concurring opinion of Mr. Justice Holmes in *Fall* v. *Eastin, supra,* p. 14.

That the case of *Anglo-American Provision Co.* v. *Davis Provision Co.,* 191 U. S. 373, is not an exception but only an appropriate application of the doctrine of *forum non conveniens,* see *Broderick* v. *Rosner,* 294 U. S. 629, 642–643.

[6] It has been repeatedly stated that the full faith and credit clause does not require one state to enforce the penal laws of another. See, for example, *Huntington* v. *Attrill,* 146 U. S. 657, 666; *Converse*

actual exceptions have been few and far between, apart from *Haddock* v. *Haddock*. For this Court has been reluctant to admit exceptions in case of *judgments* rendered by the courts of a sister state, since the "very purpose" of Art. IV, § 1 was "to alter the status of the several states as independent foreign sovereignties, each free to ignore obligations created under the laws or by the judicial proceedings of the others, and to make them integral parts of a single nation." *Milwaukee County* v. *White Co., supra,* pp. 276–277.

This Court, to be sure, has recognized that in case of *statutes,* "the extra-state effect of which Congress has not prescribed," some "accommodation of the conflicting interests of the two states" is necessary. *Alaska Packers Assn.* v. *Industrial Accident Comm'n,* 294 U. S. 532, 547. But that principle would come into play only in case the Nevada decrees were assailed on the ground that Nevada must give full faith and credit in its divorce proceedings to the divorce statutes of North Carolina. Even then, it would be of no avail here. For as stated in the *Alaska Packers* case, *"Prima facie* every state is entitled to enforce in its own courts its own statutes, lawfully enacted. One who challenges that right, because of the force given to a conflicting statute of another state by the full faith and credit clause, assumes the burden of showing, upon some rational basis, that of the conflicting interests involved those of the foreign state are superior to those of the

v. *Hamilton,* 224 U. S. 243, 260; *Bradford Electric Co.* v. *Clapper,* 286 U. S. 145, 160.

But the question of whether a judgment based on a penalty is entitled to full faith and credit was reserved in *Milwaukee County* v. *White Co.,* 296 U. S. 268, 279.

For other dicta that the application of the full faith and credit clause may be limited by the policy of the law of the forum, see *Bradford Electric Co.* v. *Clapper, supra,* p. 160; *Alaska Packers Assn.* v. *Industrial Accident Comm'n,* 294 U. S. 532, 546; *Broderick* v. *Rosner, supra,* note 5, p. 642.

forum." *Id.,* pp. 547–548. It is difficult to perceive how North Carolina could be said to have an interest in Nevada's domiciliaries superior to the interest of Nevada. Nor is there any authority which lends support to the view that the full faith and credit clause compels the courts of one state to subordinate the local policy of that state, as respects its domiciliaries, to the statutes of any other state. Certainly *Bradford Electric Co.* v. *Clapper,* 286 U. S. 145, did not so hold. Indeed, the recent case of *Pacific Employers Ins. Co.* v. *Industrial Accident Comm'n,* 306 U. S. 493, 502, held that in the case of statutes "the full faith and credit clause does not require one state to substitute for its own statute, applicable to persons and events within it, the conflicting statute of another state, even though that statute is of controlling force in the courts of the state of its enactment with respect to the same persons and events."

Moreover, *Haddock* v. *Haddock* is not based on the contrary theory. Nor did it hold that a decree of divorce granted by the courts of one state need not be given full faith and credit in another if the grounds for the divorce would not be recognized by the courts of the forum. It does not purport to challenge or disturb the rule, earlier established by *Christmas* v. *Russell, supra,* and subsequently fortified by *Fauntleroy* v. *Lum, supra,* that, even though the cause of action could not have been entertained in the state of the forum, a judgment obtained thereon in a sister state is entitled to full faith and credit. For the majority opinion in the *Haddock* case accepted both *Cheever* v. *Wilson,* 9 Wall. 108, and *Atherton* v. *Atherton,* 181 U. S. 155. *Cheever* v. *Wilson* held that a decree of divorce granted by a state in which one spouse was domiciled and which had personal jurisdiction over the other was as conclusive in other states as it was in the state where it was obtained. *Atherton* v. *Atherton* held that full faith and credit must be given a decree of divorce granted by

the state of the matrimonial domicil on constructive service against the other spouse who was a non-resident of that state. The decisive difference between those cases and *Haddock* v. *Haddock* was said to be that, in the latter, the state granting the divorce had no jurisdiction over the absent spouse, since it was not the state of the matrimonial domicil, but the place where the husband had acquired a separate domicil after having wrongfully left his wife. This Court accordingly classified *Haddock* v. *Haddock* with that group of cases which hold that when the courts of one state do not have jurisdiction either of the subject matter or of the person of the defendant, the courts of another state are not required by virtue of the full faith and credit clause to enforce the judgment.[7] But such differences in result between *Haddock* v. *Haddock* and the cases which preceded it rest on distinctions which in our view are immaterial, so far as the full faith and credit clause and the supporting legislation are concerned.

The historical view that a proceeding for a divorce was a proceeding *in rem* (2 Bishop, Marriage & Divorce, 4th ed., § 164) was rejected by the *Haddock* case. We likewise agree that it does not aid in the solution of the problem presented by this case to label these proceedings as proceedings *in rem*. Such a suit, however, is not a mere *in personam* action. Domicil of the plaintiff, immaterial to jurisdiction in a personal action, is recognized in the *Haddock* case and elsewhere (Beale, Conflict of Laws, § 110.1) as essential in order to give the court jurisdiction which will entitle the divorce decree to extraterritorial effect, at least when the defendant has neither been personally served nor entered an appearance. The findings

---

[7] *Grover & Baker Machine Co.* v. *Radcliffe*, 137 U. S. 287; *National Exchange Bank* v. *Wiley*, 195 U. S. 257; *Baker* v. *Baker, Eccles & Co.*, 242 U. S. 394; *Chicago Life Ins. Co.* v. *Cherry*, 244 U. S. 25, 29; *Flexner* v. *Farson*, 248 U. S. 289.

made in the divorce decrees in the instant case must be treated on the issue before us as meeting those requirements. For it seems clear that the provision of the Nevada statute that a plaintiff in this type of case must "reside" in the State for the required period [8] requires him to have a domicil,[9] as distinguished from a mere residence, in the state. *Latterner* v. *Latterner,* 51 Nev. 285, 274 P. 194; *Lamb* v. *Lamb,* 57 Nev. 421, 65 P. 2d 872. Hence, the decrees in this case, like other divorce decrees, are more than *in personam* judgments. They involve the marital status of the parties. Domicil creates a relationship to the state which is adequate for numerous exercises of state power. See *Lawrence* v. *State Tax Commission,* 286 U. S. 276, 279; *New York ex rel. Cohn* v. *Graves,* 300 U. S. 308, 313; *Milliken* v. *Meyer,* 311 U. S. 457, 463–464; *Skiriotes* v. *Florida,* 313 U. S. 69. Each state as a sovereign has a rightful and legitimate concern in the marital status of persons domiciled within its borders. The marriage relation creates problems of large social importance. ·Protection of offspring, property interests, and the enforcement of marital responsibilities are but a few of commanding problems in the field of domestic relations with which the state must deal. Thus it is plain that each state, by virtue of its command over its domiciliaries and its large interest in the institution of marriage, can alter within its

---

[8] Sec. 9460, Nev. Comp. L. 1929, as amended L. 1931, p. 161, *supra,* note 3.

[9] The fact that a stay in a state is not for long is not necessarily fatal to the existence of a domicil. As stated in *Williamson* v. *Osenton,* 232 U. S. 619, 624, the "essential fact that raises a change of abode to a change of domicil is the absence of any intention to live elsewhere." The intention to stay for a time to which a person "did not then contemplate an end" was held sufficient. *Id.,* p. 625. And see *District of Columbia* v. *Murphy,* 314 U. S. 441. Nor is there any doubt that a married woman may acquire in this country a domicil separate from her husband. *Williamson* v. *Osenton, supra,* pp. 625–626, and cases cited.

own borders the marriage status of the spouse domiciled there, even though the other spouse is absent. There is no constitutional barrier if the form and nature of the substituted service (see *Milliken* v. *Meyer, supra,* p. 463) meet the requirements of due process. *Atherton* v. *Atherton, supra,* p. 172. Accordingly, it was admitted in the *Haddock* case that the divorce decree, though not recognized in New York, was binding on both spouses in Connecticut where granted. 201 U. S. 569, 572, 575, 579. And this Court in *Maynard* v. *Hill,* 125 U. S. 190, upheld the validity within the Territory of Oregon of a divorce decree granted by the legislature to a husband domiciled there, even though the wife resided in Ohio where the husband had deserted her. It therefore follows that, if the Nevada decrees are taken at their full face value (as they must be on the phase of the case with which we are presently concerned), they were wholly effective to change in that state the marital status of the petitioners and each of the other spouses by the North Carolina marriages. Apart from the requirements of procedural due process (*Atherton* v. *Atherton, supra,* p. 172) not challenged here by North Carolina, no reason based on the Federal Constitution has been advanced for the contrary conclusion. But the concession that the decrees were effective in Nevada makes more compelling the reasons for rejection of the theory and result of the *Haddock* case.

This Court stated in *Atherton* v. *Atherton, supra,* p. 162, that "A husband without a wife, or a wife without a husband, is unknown to the law." But if one is lawfully divorced and remarried in Nevada and still married to the first spouse in North Carolina, an even more complicated and serious condition would be realized. We would then have what the Supreme Court of Illinois declared to be the "most perplexing and distressing complications in the domestic relations of many citizens in the different States." *Dunham* v. *Dunham,* 162 Ill. 589, 607. Under the cir-

cumstances of this case, a man would have two wives, a wife two husbands. The reality of a sentence to prison proves that that is no mere play on words. Each would be a bigamist for living in one state with the only one with whom the other state would permit him lawfully to live. Children of the second marriage would be bastards in one state but legitimate in the other. And all that would flow from the legalistic notion that where one spouse is wrongfully deserted he retains power over the matrimonial domicil so that the domicil of the other spouse follows him wherever he may go, while, if he is to blame, he retains no such power. But such considerations are inapposite. As stated by Mr. Justice Holmes in his dissent in the *Haddock* case (201 U. S. p. 630), they constitute a "pure fiction, and fiction always is a poor ground for changing substantial rights." Furthermore, the fault or wrong of one spouse in leaving the other becomes under that view a jurisdictional fact on which this Court would ultimately have to pass. Whatever may be said as to the practical effect which such a rule would have in clouding divorce decrees, the question as to where the fault lies has no relevancy to the existence of state power in such circumstances. See Bingham, *In the Matter of Haddock* v. *Haddock*, 21 Corn. L. Q. 393, 426. The existence of the power of a state to alter the marital status of its domiciliaries, as distinguished from the wisdom of its exercise, is not dependent on the underlying causes of the domestic rift. As we have said, it is dependent on the relationship which domicil creates and the pervasive control which a state has over marriage and divorce within its own borders. *Atherton* v. *Atherton,* which preceded *Haddock* v. *Haddock,* and *Thompson* v. *Thompson,* 226 U. S. 551, which followed it, recognized that the power of the state of the matrimonial domicil to grant a divorce from the absent spouse did not depend on whether his departure from the state was or was not

justified. As stated above, we see no reason, and none has here been advanced, for making the existence of state power depend on an inquiry as to where the fault in each domestic dispute lies. And it is difficult to prick out any such line of distinction in the generality of the words of the full faith and credit clause. Moreover, so far as state power is concerned, no distinction between a matrimonial domicil and a domicil later acquired has been suggested or is apparent. See Mr. Justice Holmes dissenting, *Haddock* v. *Haddock, supra,* p. 631; Goodrich, *Matrimonial Domicile,* 27 Yale L. Journ. 49. It is one thing to say as a matter of state law that jurisdiction to grant a divorce from an absent spouse should depend on whether by consent or by conduct the latter has subjected his interest in the marriage status to the law of the separate domicil acquired by the other spouse. Beale, Conflict of Laws, § 113.11; Restatement, Conflict of Laws, § 113. But where a state adopts, as it has the power to do, a less strict rule, it is quite another thing to say that its decrees affecting the marital status of its domiciliaries are not entitled to full faith and credit in sister states. Certainly if decrees of a state altering the marital status of its domiciliaries are not valid throughout the Union even though the requirements of procedural due process are wholly met, a rule would be fostered which could not help but bring "considerable disaster to innocent persons" and "bastardize children hitherto supposed to be the offspring of lawful marriage" (Mr. Justice Holmes dissenting in *Haddock* v. *Haddock, supra,* p. 628), or else encourage collusive divorces. Beale, *Constitutional Protection of Decrees for Divorce,* 19 Harv. L. Rev. 586, 596. These intensely practical considerations emphasize for us the essential function of the full faith and credit clause in substituting a command for the former principles of comity (*Broderick* v. *Rosner, supra,* p. 643) and in altering the "status of the several states as independent foreign

sovereignties" by making them "integral parts of a single nation." *Milwaukee County* v. *White Co., supra,* p. 277.

It is objected, however, that if such divorce decrees must be given full faith and credit, a substantial dilution of the sovereignty of other states will be effected. For it is pointed out that under such a rule one state's policy of strict control over the institution of marriage could be thwarted by the decree of a more lax state. But such an objection goes to the application of the full faith and credit clause to many situations. It is an objection in varying degrees of intensity to the enforcement of a judgment of a sister state based on a cause of action which could not be enforced in the state of the forum. Mississippi's policy against gambling transactions was overridden in *Fauntleroy* v. *Lum, supra,* when a Missouri judgment based on such a Mississippi contract was enforced by this Court. Such is part of the price of our federal system.

This Court, of course, is the final arbiter when the question is raised as to what is a permissible limitation on the full faith and credit clause. *Alaska Packers Assn.* v. *Industrial Accident Comm'n, supra,* p. 547; *Milwaukee County* v. *White Co., supra,* p. 274. But the question for us is a limited one. In the first place, we repeat that in this case we must assume that petitioners had a *bona fide* domicil in Nevada, not that the Nevada domicil was a sham. We thus have no question on the present record whether a divorce decree granted by the courts of one state to a resident, as distinguished from a domiciliary, is entitled to full faith and credit in another state. Nor do we reach here the question as to the power of North Carolina to refuse full faith and credit to Nevada divorce decrees because, contrary to the findings of the Nevada court, North Carolina finds that no *bona fide* domicil was acquired in Nevada. In the second place, the question as to what is a permissible limitation on the full faith and

credit clause does not involve a decision on our part as to which state policy on divorce is the most desirable one. It does not involve selection of a rule which will encourage on the one hand or discourage on the other the practice of divorce. That choice in the realm of morals and religion rests with the legislatures of the states. Our own views as to the marriage institution and the avenues of escape which some states have created are immaterial. It is a Constitution which we are expounding—a Constitution which in no small measure brings separate sovereign states into an integrated whole through the medium of the full faith and credit clause. Within the limits of her political power North Carolina may, of course, enforce her own policy regarding the marriage relation—an institution more basic in our civilization than any other. But society also has an interest in the avoidance of polygamous marriages (*Loughran* v. *Loughran,* 292 U. S. 216, 223) and in the protection of innocent offspring of marriages deemed legitimate in other jurisdictions. And other states have an equally legitimate concern in the status of persons domiciled there as respects the institution of marriage. So, when a court of one state acting in accord with the requirements of procedural due process alters the marital status of one domiciled in that state by granting him a divorce from his absent spouse, we cannot say its decree should be excepted from the full faith and credit clause merely because its enforcement or recognition in another state would conflict with the policy of the latter. Whether Congress has the power to create exceptions (see *Yarborough* v. *Yarborough,* 290 U. S. 202, 215, nt. 2, dissenting opinion) is a question on which we express no view. It is sufficient here to note that Congress, in its sweeping requirement that judgments of the courts of one state be given full faith and credit in the courts of another, has not done so. And the considerable interests involved, and the substantial and far-reaching effects which the

allowance of an exception would have on innocent persons, indicate that the purpose of the full faith and credit clause and of the supporting legislation would be thwarted to a substantial degree if the rule of *Haddock* v. *Haddock* were perpetuated.

*Haddock* v. *Haddock* is overruled. The judgment is reversed and the cause is remanded to the Supreme Court of North Carolina for proceedings not inconsistent with this opinion.

*Reversed.*

MR. JUSTICE FRANKFURTER, concurring:

I join in the opinion of the Court but think it appropriate to add a few words.

Article 91 of the British North America Act (1867) gives the Parliament of Canada exclusive legislative authority to deal with marriage and divorce. Similarly, Article 51 of the Australia Constitution Act (1900) empowers the Commonwealth Parliament to make laws with respect to marriage and divorce. The Constitution of the United States, however, reserves authority over marriage and divorce to each of the forty-eight states. That is our starting-point. In a country like ours where each state has the constitutional power to translate into law its own notions of policy concerning the family institution, and where citizens pass freely from one state to another, tangled marital situations, like the one immediately before us, inevitably arise. They arose before and after the decision in the *Haddock* case, 201 U. S. 562, and will, I daresay, continue to arise no matter what we do today. For these complications cannot be removed by any decisions this Court can make—neither the crudest nor the subtlest juggling of legal concepts could enable us to bring forth a uniform national law of marriage and divorce.

We are not authorized nor are we qualified to formulate a national code of domestic relations. We cannot, by

making "jurisdiction" depend upon a determination of who is the deserter and who the deserted, or upon the shifting notions of policy concealed by the cloudy abstraction of "matrimonial domicile," turn this into a divorce and probate court for the United States. There may be some who think our modern social life is such that there is today a need, as there was not when the Constitution was framed, for vesting national authority over marriage and divorce in Congress, just as the national legislatures of Canada and Australia have been vested with such powers. Beginning in 1884,[1] numerous proposals to amend the Constitution to confer such authority have been introduced in Congress. But those whose business it is to amend the Constitution have not seen fit to amend it in this way. The need for securing national uniformity in dealing with divorce, either through constitutional amendment or by some other means, has long been the concern of the Conference of Governors and of special bodies convened to consider this problem. See, e. g., Proceedings of Governors' Conference (1910) 185–98; Proceedings of National Congress on Uniform Divorce Laws (1906). This Court should abstain from trying to reach the same end by indirection. We should not feel challenged by a task that is not ours, even though it is difficult. Judicial attempts to solve problems that are intrinsically legislative—because their elements do not lend themselves to judicial judgment or because the necessary remedies are of a sort which judges cannot prescribe—are apt to be as futile in their achievement as they are presumptuous in their undertaking.

---

[1] See Ames, Proposed Amendments to the Constitution of the United States during the First Century of its History, contained in the Annual Report of the American Historical Association, 1896, vol. II, p. 190; Sen. Doc. No. 93, 69th Cong., 1st Sess., and the successive compilations prepared by the Legislative Reference Service of the Library of Congress.

There is but one respect in which this Court can, within its traditional authority and professional competence, contribute uniformity to the law of marriage and divorce, and that is to enforce respect for the judgment of a state by its sister states when the judgment was rendered in accordance with settled procedural standards. As the Court's opinion shows, it is clearly settled that if a judgment is binding in the state where it was rendered, it is equally binding in every other state. This rule of law was not created by the federal courts. It comes from the Constitution and the Act of May 26, 1790, c. 11, 1 Stat. 122. Congress has not exercised its power under the Full Faith and Credit Clause to meet the special problems raised by divorce decrees. There will be time enough to consider the scope of its power in this regard when Congress chooses to exercise it.

The duty of a state to respect the judgments of a sister state arises only where such judgments meet the tests of justice and fair dealing that are embodied in the historic phrase, "due process of law." But in this case all talk about due process is beside the mark. If the actions of the Nevada court had been taken "without due process of law," the divorces which it purported to decree would have been without legal sanction in every state, including Nevada. There would be no occasion to consider the applicability of the Full Faith and Credit Clause. It is precisely because the Nevada decrees do satisfy the requirements of the Due Process Clause and are binding in Nevada upon the absent spouses that we are called upon to decide whether these judgments, unassailable in the state which rendered them, are, despite the commands of the Full Faith and Credit Clause, null and void elsewhere.

North Carolina did not base its disregard of the Nevada decrees on the claim that they were a fraud and a sham, and no claim was made here on behalf of North Carolina

that the decrees were not valid in Nevada. It is indisputable that the Nevada decrees here, like the Connecticut decree in the *Haddock* case, were valid and binding in the state where they were rendered. *Haddock* v. *Haddock*, 201 U. S. 562, 569–70; *Maynard* v. *Hill*, 125 U. S. 190; *Atherton* v. *Atherton*, 181 U. S. 155. In denying constitutional sanction to such a valid judgment outside the state which rendered it, the *Haddock* decision made an arbitrary break with the past and created distinctions incompatible with the rôle of this Court in enforcing the Full Faith and Credit Clause. Freed from the hopeless refinements introduced by that case, the question before us is simply whether the Nevada decrees were rendered under circumstances that would make them binding against the absent spouses in the state where they were rendered. North Carolina did not challenge the power of Nevada to declare the marital status of persons found to be Nevada residents. North Carolina chose instead to disrespect the consequences of Nevada's exertion of such power. It is therefore no more rhetorical to say that Nevada is seeking to impose its policy upon North Carolina than it is to say that North Carolina is seeking to impose its policy upon Nevada.

For all but a very small fraction of the community the niceties of resolving such conflicts among the laws of the states are, in all likelihood, matters of complete indifference. Our occasional pronouncements upon the requirements of the Full Faith and Credit Clause doubtless have little effect upon divorces. Be this as it may, a court is likely to lose its way if it strays outside the modest bounds of its own special competence and turns the duty of adjudicating only the legal phases of a broad social problem into an opportunity for formulating judgments of social policy quite beyond its competence as well as its authority.

Mr. Justice Murphy:

I dissent because the Court today introduces an undesirable rigidity in the application of the Full Faith and Credit Clause to a problem which is of acute interest to all the states of the Union and on which they hold varying and sharply divergent views, the problem of how they shall treat the marriage relation.

This case cannot be considered as one involving the Constitution alone; rather the case involves the interaction of public policy upon the Constitution. This is not to say that our function is to become censors of public morals and decide this case in accordance with what we may think is the wisest rule for society with respect to divorce. But the question of public policy enters to this degree—marriage and the family have generally been regarded as basic components of our national life, and the solution of the problems engendered by the marital relation, the formulation of standards of public morality in connection therewith, and the supervision of domestic (in the sense of family) affairs, have been left to the individual states. Each state has the deepest concern for its citizens in those matters, and, concomitantly with that concern, it exercises the widest control over marriage, determining how it is to be solemnized, the attendant obligations, and how it may be dissolved. When a conflict arises between the divergent policies of two states in this area of legitimate governmental concern, as here, this Court should give appropriate consideration to the interests of each state.

In recognition of the paramount interest of the state of domicile over the marital status of its citizens, this Court has held that actual good faith domicile of at least one party is essential to confer authority and jurisdiction on the courts of a state to render a decree of divorce that will be entitled to extraterritorial effect under the

Full Faith and Credit Clause, *Bell* v. *Bell*, 181 U. S. 175, even though both parties personally appear, *Andrews* v. *Andrews*, 188 U. S. 14. When the doctrine of those cases is applied to the facts of this one, the question becomes a simple one: Did petitioners acquire a bona fide domicile in Nevada? I agree with my brother Jackson that the only proper answer on the record is, no. North Carolina is the state in which petitioners have their roots, the state to which they immediately returned after a brief absence just sufficient to achieve their purpose under Nevada's requirements. It follows that the Nevada decrees are entitled to no extraterritorial effect when challenged in another state. *Bell* v. *Bell, supra; Andrews* v. *Andrews, supra.*

This is not to say that the Nevada decrees are without any legal effect in the State of Nevada. That question is not before us. It may be that for the purposes of that state the petitioners have been released from their marital vows, consistently with the procedural requirements of the Fourteenth Amendment, on the basis of compliance with its residential requirements and constructive service of process on the non-resident spouses. But conceding the validity in Nevada of its decrees dissolving the marriages, it does not mechanically follow that the Full Faith and Credit Clause compels North Carolina to accept them.

We have recognized an area of flexibility in the application of the Clause to preserve and protect state policies in matters of vital public concern. We have said that conflicts between such state policies should be resolved, "not by giving automatic effect to the full faith and credit clause, . . . but by appraising the governmental interests of each jurisdiction, and turning the scale of decision according to their weight." *Alaska Packers Assn.* v. *Comm'n,* 294 U. S. 532, 547. (See also *Milwaukee County* v. *White Co.,* 296 U. S. 268, 273–274, and compare the dissenting opinion in *Yarborough* v. *Yarborough,* 290 U. S.

202, 213–227.) That Clause should no more be read "with literal exactness like a mathematical formula" than are other great and general clauses of the Constitution placing limitations upon the States to weld us into a Nation. Cf. *Home Bldg. & L. Assn.* v. *Blaisdell,* 290 U. S. 398, 428. Rather it should be construed to harmonize its direction "with the necessary residuum of state power." *Id.,* at p. 435.

Prominent in the residuum of state power, as pointed out above, is the right of a state to deal with the marriage relations of its citizens and to pursue its chosen domestic policy of public morality in that connection. Both Nevada and North Carolina have rights in this regard which are entitled to recognition. The conflict between those rights here should not be resolved by extending into North Carolina the effects of Nevada's action through a perfunctory application of the literal language of the Full Faith and Credit Clause, with the result that measures which North Carolina has adopted to safeguard the welfare of her citizens in this area of legitimate governmental concern are undermined. When the interests are considered, those of North Carolina are of sufficient validity that they should as clearly free her of the compulsions of the Full Faith and Credit Clause as did the interest of the state in the devolution of property within its boundaries in *Fall* v. *Eastin,* 215 U. S. 1; *Olmsted* v. *Olmsted,* 216 U. S. 386, and *Hood* v. *McGehee,* 237 U. S. 611, or the interests of a state in the application of its own workmen's compensation statute in *Alaska Packers Assn.* v. *Comm'n, supra,* or its interest in declining to enforce the penal laws of another jurisdiction, cf. *Huntington* v. *Attrill,* 146 U. S. 657, 666, all of which seem to be matters of far less concern to a state than the untrammeled enforcement within its borders of those standards of public morality with regard to the marriage relation which it considers to be in the best interests of its citizens.

There is an element of tragic incongruity in the fact that an individual may be validly divorced in one state but not in another. But our dual system of government and the fact that we have no uniform laws on many subjects give rise to other incongruities as well—for example, the common law took the logical position that an individual could have but one domicile at a time, but this Court has nevertheless said that the Full Faith and Credit Clause does not prevent conflicting state decisions on the question of an individual's domicile. Cf. *Worcester County Co.* v. *Riley*, 302 U. S. 292, 299. In the absence of a uniform law on the subject of divorce, this Court is not so limited in its application of the Full Faith and Credit Clause that it must force Nevada's policy upon North Carolina, any more than it must compel Nevada to accept North Carolina's requirements. The fair result is to leave each free to regulate within its own area the rights of its own citizens.

MR. JUSTICE JACKSON, dissenting:

I cannot join in exerting the judicial power of the Federal Government to compel the State of North Carolina to subordinate its own law to the Nevada divorce decrees. The Court's decision to do so reaches far beyond the immediate case. It subjects matrimonial laws of each state to important limitations and exceptions that it must recognize within its own borders and as to its own permanent population. It nullifies the power of each state to protect its own citizens against dissolution of their marriages by the courts of other states which have an easier system of divorce. It subjects every marriage to a new infirmity, in that one dissatisfied spouse may choose a state of easy divorce, in which neither party has ever lived, and there commence proceedings without personal service of process. The spouse remaining within the state of domicile need never know of the proceedings. Or, if they

come to one's knowledge, the choice is between equally useless alternatives: one is to ignore the foreign proceedings, in which case the marriage is quite certain to be dissolved; the other is to follow the complaining spouse to the state of his choice and there defend under the laws which grant the dissolution on relatively trivial grounds. To declare that a state is powerless to protect either its own policy or the family rights of its people against such consequences has serious constitutional implications. It is not an exaggeration to say that this decision repeals the divorce laws of all the states and substitutes the law of Nevada as to all marriages one of the parties to which can afford a short trip there. The significance of this decision is best appraised by orienting its facts with reference to the States involved, for the court approves this concrete case as a pattern which anybody in any state may henceforth follow under the protection of the federal courts.

From the viewpoint of North Carolina, this is the situation: The Williamses, North Carolina people, were married in North Carolina, lived there twenty-five years, and have four children. The Hendrixes were also married in North Carolina and resided there some twenty years. In May of 1940, Mr. Williams and Mrs. Hendrix left their homes and respective spouses, departed the state, but after an absence of a few weeks reappeared and set up housekeeping as husband and wife. North Carolina then had on its hands three marriages among four people in the form of two broken families, and one going concern. What problems were thereby created as to property or support and maintenance, we do not know. North Carolina, for good or ill, has a strict policy as to divorce. The situation is contrary to its laws, and it has attempted to vindicate its own law by convicting the parties of bigamy.

The petitioners assert that North Carolina is made powerless in the matter, however, because of proceedings

carried on in Nevada during their brief absence from North Carolina. We turn to Nevada for that part of the episode.

Williams and Mrs. Hendrix appear in the State of Nevada on May 15, 1940. For barely six weeks they made their residences at the Alamo Auto Court on the Las Vegas-Los Angeles Road. On June 26, 1940, both filed bills of complaint for divorce through the same lawyer, and alleging almost identical grounds. No personal service was made on the home-staying spouse in either case; and service was had only by publication and substituted service. Both obtained divorce decrees. The Nevada policy of divorce is reflected in Mrs. Hendrix's case. Her grounds were "extreme mental cruelty." She sustained them by testifying that her husband was "moody"; did not talk or speak to her "often"; when she spoke to him he answered most of the time by a nod or shake of the head and "there was nothing cheerful about him at all." The latter of the two divorces was granted on October 4, 1940, and on that day in Nevada they had benefit of clergy and emerged as man and wife. Nevada having served its purpose in their affairs, they at once returned to North Carolina to live.

The question is whether this court will now prohibit North Carolina from enforcing its own policy within that State against these North Carolinians on the ground that the law of Nevada under which they lived a few weeks is in some way projected into North Carolina to give them immunity.

## I.

### OUR FUNCTION IN THE MATTER.

There is confided to the Court only the power to resolve constitutional questions raised by these divorce procedures, and not moral, religious, or social questions as to divorce itself. I do not know with any certainty whether

in the long run strict or easy divorce is best for society or whether either has much effect on moral conduct. It is enough for judicial purposes that to each state is reserved constitutional power to determine its own divorce policy. It follows that a federal court should uphold impartially the right of Nevada to adopt easy divorce laws and the right of North Carolina to enact severe ones. No difficulties arise so long as each state applies its laws to its own permanent inhabitants. The complications begin when one state opens its courts and extends the privileges of its laws to persons who never were domiciled there and attempts to visit disadvantages therefrom upon persons who have never lived there, have never submitted to the jurisdiction of its courts, and have never been lawfully summoned by personal service of process. This strikes at the orderly functioning of our federal constitutional system, and raises questions for us.

The prevailing opinion rests upon a line of cases of which *Christmas* v. *Russell*, 5 Wall. 290, is typical. There it was said that "If a judgment is conclusive in the state where it was pronounced, it is equally conclusive everywhere." *Id.* at 302. This rule was uttered long ago in very different circumstances. The judgment there in question was on a promissory note, and the Court also said that: "Nothing can be plainer than the proposition is, that the judgment . . . was a valid judgment in the State where it was rendered. Jurisdiction of the case was undeniable, and the defendant being found in that jurisdiction, was duly served with process, and appeared and made full defense." *Id.* at 301. But the same defendant tried to relitigate his lost cause when it was sought to give that judgment effect in his home state. This Court properly held that it was not competent for the courts of any other state to reopen the merits of the cause. This very wise rule against collateral impeachment of an ordinary judgment based upon personal jurisdiction is now

made to support the theory that we must enforce these very different Nevada judgments without more than formal inquiry into the jurisdiction of the court that rendered them.

The effect of the Court's decision today—that we must give extraterritorial effect to any judgment that a state honors for its own purposes—is to deprive this Court of control over the operation of the full faith and credit and the due process clauses of the Federal Constitution in cases of contested jurisdiction and to vest it in the first state to pass on the facts necessary to jurisdiction. It is for this Court, I think, not for state courts, to implement these great but general clauses by defining those judgments which are to be forced upon other states.

Conflict between policies, laws, and judgments of constituent states of our federal system is an old, persistent, and increasingly complex problem. The right of each state to experiment with rules of its own choice for governing matrimonial and social life is greatly impaired if its own authority is overlapped and its own policy is overridden by judgments of other states forced on it by the power of this Federal Court. If we are to extend protection to the orderly exercise of the right of each state to make its own policy, we must find some way of confining each state's authority to matters and persons that are by some standard its own.

The framers of the Constitution did not lay down rules to guide us in selecting which of two conflicting state judgments or public acts would receive federal aid in its extraterritorial enforcement. Nor was it necessary. There was, and is, an adequate body of law, if we do not reject it, by which to test jurisdiction or power to render the judgments in question so far as faith and credit by federal command is concerned. By the application of well established rules these judgments fail to merit enforcement for two reasons.

## II.

### LACK OF DUE PROCESS OF LAW.

Thirty-seven years ago this Court decided that a state court, even of the plaintiff's domicile, could not render a judgment of divorce that would be entitled to federal enforcement in other states against a nonresident who did not appear, and was not personally served with process. *Haddock* v. *Haddock,* 201 U. S. 562 (1905 Term). The opinion was much criticized, particularly in academic circles.[1] Until today, however, it has been regarded as law, to be accepted and applied, for good or ill, depending on one's view of the matter. The theoretical reasons for the change are not convincing.

The opinion concedes that Nevada's judgment could not be forced upon North Carolina in absence of personal service if a divorce proceeding were an action *in personam.* In other words, settled family relationships may be destroyed by a procedure that we would not recognize if the suit were one to collect a grocery bill.[2]

We have been told that this is because divorce is a proceeding *in rem.* The marriage relation is to be reified and treated as a *res.* Then it seems that this *res* follows a fugitive from matrimony into a state of easy divorce, although the other party to it remains at home where the *res* was contracted and where years of cohabitation would seem to give it local situs. Would it be less logical to hold that the continued presence of one party to a marriage

---

[1] It was twenty years before Professor Beale could justify the decision to his satisfaction. Compare Haddock Revisited, 39 Harvard Law Review 417, with Beale, Constitutional Protection of Decrees for Divorce, 19 Harvard Law Review 586. Others seem to lack his capacity for quick adjustment.

[2] *Pennoyer* v. *Neff,* 95 U. S. 714; *Riverside & Dan River Cotton Mills* v. *Meneffee,* 237 U. S. 189; cf. *McDonald* v. *Mabee,* 243 U. S. 90; *Flexner* v. *Farson,* 248 U. S. 289; *Doherty & Co.* v. *Goodman,* 294 U. S. 623; *Milliken* v. *Meyer,* 311 U. S. 457.

gives North Carolina power to protect the *res*, the mar·· riage relation, than to hold that the transitory presence of one gives Nevada power to destroy it? Counsel at the bar met this dilemma by suggesting that the *res* exists in duplicate—one for each party to the marriage. But this seems fatal to the decree, for if that is true the dissolution of the *res* in transit would hardly operate to dissolve the *res* that stayed in North Carolina. Of course this discussion is only to reveal the artificial and fictional character of the whole doctrine of a *res* as applied to a divorce action.

I doubt that it promotes clarity of thinking to deal with marriage in terms of a *res*, like a piece of land or a chattel. It might be more helpful to think of marriage as just marriage—a relationship out of which spring duties to both spouse and society and from which are derived rights,—such as the right to society and services and to conjugal love and affection—rights which generally prove to be either priceless or worthless, but which none the less the law sometimes attempts to evaluate in terms of money when one is deprived of them by the negligence or design of a third party.

It does not seem consistent with our legal system that one who has these continuing rights should be deprived of· them without a hearing. Neither does it seem that he or she should be summoned by mail, publication, or otherwise to a remote jurisdiction chosen by the other party and there be obliged to submit marital rights to adjudication under a state policy at odds with that of the state under which the marriage was contracted and the matrimonial domicile was established.

Marriage is often dealt with as a contract. Of course a personal judgment could not be rendered against an absent party on a cause of action arising out of an ordinary commercial contract, without personal service of process. I see no reason why the marriage contract, if such it be

considered, should be discriminated against, nor why a party to a marriage contract should be more vulnerable to a foreign judgment without process than a party to any other contract. I agree that the marriage contract is different, but I should think the difference would be in its favor.

The Court thinks the difference is the other way: we are told that divorce is not a "mere *in personam* action" since *Haddock* v. *Haddock, supra,* held that domicile is necessary to jurisdiction for divorce. But to hold that a state cannot have divorce jurisdiction unless it is the domicile is not to hold that it must have such jurisdiction if it is the domicile, as *Haddock* v. *Haddock* itself demonstrates. Further support for this view seems to be seen in *Maynard* v. *Hill,* 125 U. S. 190, and in the Court's subsequent approval of that case in *Haddock* v. *Haddock, supra,* at 569, 572, 574, 575, 579. All that *Maynard* v. *Hill* decided was that the Territory of Washington had jurisdiction to cut off any interest of an absent spouse in land within its borders. But protection of land in the jurisdiction and protection against bigamy prosecutions out of the jurisdiction are plainly different matters.[3]

Although the Court concedes that its present decision would be insupportable if divorce were a "mere *in personam* action," it relies for support on opinions that the state where one is domiciled has the power to enter valid criminal, tax, and simple money judgments *against*—not *for*—him.[4] Those opinions are wholly inapposite unless

---

[3] Cf. *Arndt* v. *Griggs,* 134 U. S. 316; *Dewey* v. *Des Moines,* 173 U. S. 193; *Fall* v. *Eastin,* 215 U. S. 1; *Olmsted* v. *Olmsted,* 216 U. S. 386; *Hood* v. *McGehee,* 237 U. S. 611; *Grannis* v. *Ordean,* 234 U. S. 385; *Clark* v. *Williard,* 294 U. S. 211; *Pink* v. *A. A. A. Highway Express Co.,* 314 U. S. 201.

[4] *Lawrence* v. *State Tax Commission,* 286 U. S. 276, 279; *New York ex rel. Cohn* v. *Graves,* 300 U. S. 308, 313; *Milliken* v. *Meyer,* 311 U. S. 457, 463–464; *Skiriotes* v. *Florida,* 313 U. S. 69.

they mean that Nevada has jurisdiction to nullify contract rights of a person never in the state or to declare that he is not liable for the commission of crime, payment of taxes, or the breach of a contract, in another state; and I am sure that nobody has ever supposed they meant that.

To hold that the Nevada judgments were not binding in North Carolina because they were rendered without jurisdiction over the North Carolina spouses, it is not necessary to hold that they were without any conceivable validity. It may be, and probably is, true that Nevada has sufficient interest in the lives of those who sojourn there to free them and their spouses to take new spouses without incurring criminal penalties under Nevada law. I know of nothing in our Constitution that requires Nevada to adhere to traditional concepts of bigamous unions or the legitimacy of the fruit thereof. And the control of a state over property within its borders is so complete that I suppose that Nevada could effectively deal with it in the name of divorce as completely as in any other.[5] But it is quite a different thing to say that Nevada can dissolve the marriages of North Carolinians and dictate the incidence of the bigamy statutes of North Carolina by which North Carolina has sought to protect her own interests as well as theirs. In this case there is no conceivable basis of jurisdiction in the Nevada court over the absent spouses,[6] and, *a fortiori,* over North Carolina herself. I

---

[5] Cf. *Arndt* v. *Griggs; Dewey* v. *Des Moines; Grannis* v. *Ordean; Clark* v. *Williard, supra,* note 3.

[6] A spouse who appears and contests the jurisdiction of the court of another state to grant a divorce may not collaterally attack its findings of domicile and jurisdiction made after such appearance. *Davis* v. *Davis,* 305 U. S. 32. So also, a deserter from the matrimonial domicile may be bound by a divorce granted by a court of the state where the matrimonial domicile is situated. Whether fault on the part of the deserter is an essential seems on the basis of our cases on jurisdiction

cannot but think that in its preoccupation with the full faith and credit clause the Court has slighted the due process clause.

### III.

#### LACK OF DOMICILE.

We should, I think, require that divorce judgments asking our enforcement under the full faith and credit clause, unlike judgments arising out of commercial transactions and the like, must also be supported by good-faith domicile of one of the parties within the judgment state.[7]   Such is certainly a reasonable requirement.   A state can have no legitimate concern with the matrimonial status of two persons, neither of whom lives within its territory.

The Court would seem, indeed, to pay lip service to this principle.   I understand the holding to be that it is domicile in Nevada that gave power to proceed without personal service of process.   That being the course of reasoning, I do not see how we avoid the issue concerning the existence of the domicile which the facts on the face of this record put to us.   Certainly we cannot, as the Court would, by-pass the matter by saying that "we must treat the present case for the purpose of the limited issue before us precisely the same as if petitioners had resided in Ne-

for divorce to be an open question; *Atherton* v. *Atherton,* 181 U. S. 155; *Haddock* v. *Haddock, supra,* at 570, 572, 583; and *Thompson* v. *Thompson,* 226 U. S. 551; but our decisions on analogous problems might be found to afford adequate support for a decision that it is not.   Cf. *Washington ex rel. Bond & Goodwin & Tucker* v. *Superior Court,* 289 U. S. 361; *Doherty & Co.* v. *Goodman,* 294 U. S. 623. See, further, Restatement, Conflict of Laws, §§ 112, 113.

[7] This was the decision in *Bell* v. *Bell,* 181 U. S. 175; and *Andrews* v. *Andrews,* 188 U. S. 14.   *Davis* v. *Davis, supra,* note 6, in no way indicates that a finding of domicile after appearance of the absent spouse and litigation of the question would be conclusive upon the state of his domicile in litigation involving its interests and not merely those of the parties.   Cf. *Stoll* v. *Gottlieb,* 305 U. S. 165, 172, n. 13.

vada for a term of years and had long ago acquired a permanent abode there." I think we should treat it as if they had done just what they have done.

The only suggestion of a domicile within Nevada was a stay of about six weeks at the Alamo Auto Court, an address hardly suggestive of permanence. Mrs. Hendrix testified in her case (the evidence in Williams' case is not before us) that her residence in Nevada was "indefinite permanent" in character. The Nevada court made no finding that the parties had a "domicile" there. It only found a residence—sometimes, but not necessarily, an equivalent.[8] It is this Court that accepts these facts as enough to establish domicile.

While a state can no doubt set up its own standards of domicile as to its internal concerns, I do not think it can require us to accept and in the name of the Constitution impose them on other states. If Nevada may prescribe six weeks of indefinite-permanent abode in a motor court as constituting domicile, she may as readily prescribe six days. Indeed, if the Court's opinion is carried to its logical conclusion, a state could grant a constructive domicile for divorce purposes upon the filing of some sort of declaration of intention. Then it would follow that we would be required to accept it as sufficient and to force all states to recognize mail-order divorces as well as tourist divorces. Indeed, the difference is in the bother and expense—not in the principle of the thing.

The concept of domicile as a controlling factor in choice of law to govern many relations of the individual was well known to the framers of the Constitution. It was hardly contemplated that a person should be subject at once to two conflicting state policies, such as those of Nevada and North Carolina. It was undoubtedly expected that the Court would in many cases of conflict use one's domicile

---

[8] 1 Beale, Conflict of Laws (1935) § 10.3.

as an appropriate guide in selecting the law to govern his controversies.

Domicile means a relationship between a person and a locality. It is the place, and the one place, where he has his roots and his real, permanent home. The Fourteenth Amendment, in providing that one by residence in a state becomes a citizen thereof, probably used "residence" as synonymous with domicile. Thus domicile fixes the place where one belongs in our federal system. In some instances the existence of this relationship between the state and an individual may be a federal question, although this Court has been reluctant to accept that view.[9]

If in testing this judgment to determine whether it qualifies for federal enforcement we should apply the doctrine of domicile to interpretation of the full faith and credit clause, Nevada would be held to a duty to respect the statutes of North Carolina and not to interfere with their application to those whose individual as well as matrimonial domicile is within that State unless and until that domicile has been terminated. And North Carolina would not be required to yield its policy as to persons resident there except upon a showing that Nevada had acquired a domiciliary right to redefine the matrimonial status.

However, the trend of recent decision has been to break down the rigid concept of domicile as a test of the right of a state to deal with important relations of life. This trend

[9] Compare *Texas* v. *Florida,* 306 U. S. 398, with *Massachusetts* v. *Missouri,* 308 U. S. 1. And see Tweed and Sargent, Death and Taxation are Certain—But What of Domicile?, 53 Harvard Law Review 68, 76; *"Texas* v. *Florida* does not help the situation in the ordinary case because at the rates of tax prevailing in most of the states a controversy between the states of which the Supreme Court has jurisdiction can arise only if at least four states claim a tax and the estate consists of intangible property having a value of at least $30,000,000. On no other state of facts will the assets be insufficient to meet the claims of all of the claimant states."

has been particularly apparent in cases where the Court has authorized, if not indeed encouraged, the several states to set up their own standards of domicile and to make conflicting findings of domicile for the purpose of taxing the right of succession. *Worcester County Trust Co.* v. *Riley,* 302 U. S. 292. The Court has completely repudiated domicile as the measure of a state's right to tax intangible property. *State Tax Commission* v. *Aldrich,* 316 U. S. 174, 185. The present decision extends the trend to the field of matrimonial legislation. This direction is contrary to what I believe to be the purpose of our Constitution to prevent overlapping and conflict of authority between the states.

In the application of the full faith and credit clause to the variety of circumstances that arise when families break up and separate domiciles are established, there are, I grant, many areas of great difficulty. But I cannot believe that we are justified in making a demoralizing decision in order to avoid making difficult ones.

## IV.

### PRACTICAL CONSIDERATIONS.

The Court says that its judgment is "part of the price of our federal system." It is a price that we did not have to pay yesterday and that we will have to pay tomorrow, only because this Court has willed it to be so today. This Court may follow precedents, irrespective of their merits, as a matter of obedience to the rule of *stare decisis.* Consistency and stability may be so served. They are ends desirable in themselves, for only thereby can the law be predictable to those who must shape their conduct by it and to lower courts which must apply it. But we can break with established law, overrule precedents, and start a new cluster of leading cases to define what we mean, only as a matter of deliberate policy. We therefore search a

judicial pronouncement that ushers in a new order of matrimonial confusion and irresponsibility for some hint of the countervailing public good that is believed to be served by the change. Little justification is offered. And it is difficult to believe that what is offered is intended seriously.

The Court advances two "intensely practical considerations" in support of its present decision. One is the "complicated and serious condition" if "one is lawfully divorced and remarried in Nevada and still married to the first spouse in North Carolina." This of course begs the question, for the divorces were completely ineffectual for any purpose relevant to this case. I agree that it is serious if a Nevada court without jurisdiction for divorce purports to say that the sojourn of two spouses gives four spouses rights to acquire four more, but I think it far more serious to force North Carolina to acquiesce in any such proposition. The other consideration advanced is that if the Court doesn't enforce divorces such as these it will, as it puts it, "bastardize" children of the divorcees. When thirty-seven years ago Mr. Justice Holmes perpetrated this quip, it had point, for the Court was then holding divorces invalid which many, due to the confused state of the law, had thought to be good. It is difficult to find that it has point now that the shoe is on the other foot. In any event, I had supposed that our judicial responsibility is for the regularity of the law, not for the regularity of pedigrees.