[Civ. No. 13868.  Second Dist., Div. One.  Jan. 19, 1943.]

Estate of WINIFRED R. MORRIS, Deceased.  SECURITY-FIRST NATIONAL BANK OF LOS ANGELES (a National Banking Association) et al., Appellants, v. HARRY B. RILEY, as State Controller, etc., Respondent.

Joseph Scott and J. Howard Ziemann for Appellants.

James W. Hickey, Inheritance Tax Attorney, Donald R. Peck, Walter H. Miller, and Morton L. Barker, Assistant Inheritance Tax Attorneys, and T. H. Christiansen, Deputy Inheritance Tax Attorney, for Respondent.

WHITE, J.—This appeal is prosecuted by the administrator with the will annexed of the above entitled estate and by the administrator with the will annexed of the sole legatee and beneficiary of such estate, from an order of the Superior Court of Los Angeles County determining and fixing the amount of the inheritance tax in said estate.

The facts are stipulated and without dispute. Epitomized, they are that by decree of the probate court of the city of Providence, State of Rhode Island, on the 23rd day of March, 1934, John F. Morris, an unmarried man then of the age of 92 years, duly and legally adopted as his child, Winifred R. Morris, the above named decedent, who was his niece, then of the age of 61 years, and both of whom were then domiciled in that state. The adoptive father and the adopted child thereafter made mutual wills exclusively in favor of each other. The adopted child, decedent herein, died domiciled in Los Angeles on the 7th day of October, 1940, predeceasing her adoptive father who was the sole legatee under the terms of her will, which was thereafter duly admitted to probate; her entire estate consisted of personal property. The adoptive father died on the 18th day of November, 1940. The inheritance tax appraiser appointed herein correctly reported that the clear market value of the taxable property in the above entitled estate was $502,659.36.

The California inheritance tax appraiser found, determined and reported to the court that the inheritance tax to be charged against John F. Morris, the sole legatee herein, would be based upon the collateral relationship of uncle of the decedent adopted daughter, Winifred R. Morris, resulting in a tax of $64,118.90, and not upon the direct relationship of "lineal ancestor," which would result in a tax of only $37,415.94.

Objections having been duly filed on behalf of the administrators hereinbefore referred to, the matter proceeded to hearing before the court, resulting in an order of said court overruling the objections filed, approving the report of the inheritance tax appraiser and directing that the amount of

the inheritance tax to be paid on the estate be fixed in the sum of $64,118.90. It is from such order that this appeal is taken.

For the first ground of appeal it is urged by appellants that the court's finding, "That the Rhode Island adoption of Winifred R. Morris by John F. Morris when Winifred R. Morris was sixty-one years of age did not have the effect of creating a relationship of parent and child between said parties which can be recognized under the law of this state, for the reason that the adoption of adults is against the public policy of this state," is without support in the uncontradicted evidence and is unsupported by law. It is agreed herein that the adoption proceedings were regularly and duly had in accordance with the laws of the State of Rhode Island, and that the adoption of an adult, younger in age than the adoptive parent, is legal and authorized by the laws of that state. It is also stipulated that, under the laws of Rhode Island, one adopted as was the decedent herein shall be deemed for the purpose of inheritance and all other legal consequences and incidents of the natural relation of parents and children, the child of the parents by adoption, the same as if such adopted child had been born to the adoptive parents in lawful wedlock, excepting that such adopted child shall not be capable of taking property expressly limited to the heirs of the body or bodies of the parents by adoption, nor property from a lineal or collateral kindred of such parents by right of representation. Manifestly, under the laws of the State of Rhode Island the full and complete relationship of parent and child ensued in that state from adoption proceedings. Bearing in mind that the decedent died while domiciled in California and that the estate consists in its entirety of personalty, it seems pertinent to here set forth section 228 of the Civil Code of California, which provides: "A child, when adopted, may take the family name of the person adopting. After adoption, the two shall sustain towards each other the legal relation of parent and child, and have all the rights and be subject to all the duties of that relation." Section 257 of our Probate Code reads: "An adopted child succeeds to the estate of one who has adopted him, the same as a natural child; and the person adopting succeeds to the estate of an adopted child, the same as a natural parent. An adopted child does not succeed to the estate of a natural parent when the relationship between them has been severed

by the adoption, nor does such natural parent succeed to the estate of such adopted child."

From the foregoing it follows that if the adoption proceedings had in the State of Rhode Island are to be recognized in California, then the relation of parent and child existed between John F. Morris and the decedent herein, and if such be the case then under the laws of this state (§ 257, Prob. Code), in accordance with and by which the property herein is to be distributed, the adoptive father inherits from his adopted child just as a natural parent would inherit from his natural child.

Respondent, however, contends that a person who has legally become, as in the instant case, the adoptive parent of an adult under Rhode Island laws, which permit the adoption of adults, is not recognized as an adoptive parent for any purpose under the laws of the State of California. In support of this claim we are cited by respondent to section 221 of the Civil Code and the sections following, from section 222 to section 230 of the same code. It must be conceded that the law of California authorizes only the adoption of minor children and that it is legally impossible to adopt an adult under the laws of this state (*Estate of Taggart,* 190 Cal. 493 [213 P. 504, 27 A.L.R. 1360].) Relying upon the rule that the laws of a state can have no extraterritorial force and effect except through the doctrine of comity, we are urged by respondent to hold that if the law of Rhode Island permitting the adoption of an adult is given force and effect in this state, such action would be violative of the laws of California and its public policy; for which reason it is asserted we should not give effect, by way of comity, to the laws of a sister state when such laws substantially conflict with our own statutes and an announced public policy that has endured in California for more than seventy years. That the policy of permitting adoption of adults is not generally regarded as offensive to public morals and is not unusual is attested by the fact that in some twenty-two states, as well as in the District of Columbia, adoption of adults is permitted and authorized by express statute or by judicial interpretation. There is also creditable authority for stating the rule to be that the question whether the child has acquired the status of an adopted child, so as to allow him to inherit property in a state other than that of his adoption, will be determined by the law creating the adoption, though

that law, in respect to form and procedure of adoption be dissimilar to that of the situs of the property. In other words, if the child had been legally adopted in accordance with the laws of one state, the status created by such adoption, with the right to inheritance, and other incidental rights flowing therefrom, will follow him to and be respected as well as recognized in the state where the property is, to the extent that the law of the latter state allows a child there adopted to inherit. (1 Am.Jur. 668.) It does not seem to us that because there is a variance between the laws of two sovereignties that the courts of one state should refuse to recognize the status of a person created by the laws of another unless to extend such recognition would be contrary to pure morals or abstract justice and harmful to its own people. The heretofore noted widespread recognition by the states of the Union of the adoption of adults it seems to us militates against any conclusion that to recognize such adoptions would infringe upon or outrage public morals and justice. Respondent further urges upon us that "to recognize adoptions of adults in other states and countries might prove a serious threat to the revenue from inheritance taxes, since it would open up an avenue for the evasion or minimizing of taxes through the simple device of adoption of an adult in another state which allowed such procedure, who would otherwise have been taxable as a stranger or as one otherwise falling in higher taxing brackets." This contention does not appear alarming to us when we contemplate the rarity of questions such as the present litigation presents. Diligent search by counsel on both sides of the instant case has failed to reveal a single case disposing of the problems involved in the one at bar, while our own research has gone similarly unrewarded.

■ A much more serious question however is presented when we contemplate the full faith and credit clause of the federal Constitution, which in section 1 of article IV provides in part as follows: "Full faith and credit shall be given in each State to the public Acts, Records and judicial Proceedings of every other State. . . . "

That the status or relationship of parent and child was established between John F. Morris and the decedent herein by judicial proceedings in the State of Rhode Island cannot be successfully challenged. Is not the State of California and its courts bound by the United States Constitution to give full faith and credit in this state to the status thus

created between the aforesaid persons by a valid and legal decree of the Rhode Island courts? The recent pronouncement of the United States Supreme Court in the case of *Williams and Hendrix, Petitioners,* v. *State of North Carolina,* —— U.S. —— [63 S.Ct. 207, 87 L.Ed. ——, 143 A.L.R. 1273], decided December 21, 1942, we regard as decisive of the question presented to us concerning the duty and obligation of the courts of California under the full faith and credit clause of the federal Constitution to give complete recognition to the status of adopted daughter and adoptive father as established by decree of the Rhode Island court. In the cited case the facts were that both petitioners were married to other spouses in the State of North Carolina, where they resided with such spouses over a period of years. In 1940 both petitioners went to the State of Nevada and instituted divorce proceedings against their respective spouses, the latter of whom never resided in Nevada but were served with summons by publication. A decree of divorce was granted each petitioner by the Nevada court, which found among other things that each petitioner "has been and now is a bona fide and continuous resident of the County of Clark, State of Nevada, and had been such resident for more than six weeks immediately preceding the commencement of this action in the manner prescribed by law." After obtaining their respective Nevada decrees the petitioners were married to each other in the State of Nevada and thereupon returned to the State of North Carolina where they lived together until they were indicted, tried and convicted of bigamous cohabitation under section 4342 of the North Carolina Code. Following the affirmance of such conviction by the Supreme Court of North Carolina the case went to the United States Supreme Court upon certiorari. At the trial of petitioners in the North Carolina court the prosecution contended and the court instructed the jury that since neither of the defendants in the Nevada divorce actions was served in Nevada nor entered an appearance there, the Nevada decrees of divorce could not be recognized as valid in North Carolina. The State of North Carolina further contended that petitioners went to the State of Nevada not to establish a bona fide residence but solely for the purpose of taking advantage of the laws of that state to obtain a divorce through fraud upon that court. The North Carolina Supreme Court in affirming the judgment of conviction held that North Carolina was not required to rec-

ognize the Nevada decrees under the full faith and credit clause of the United States Constitution. In reversing the judgment of conviction against petitioners the United States Supreme Court said: "Article IV, Sec. 1 of the Constitution not only directs that 'Full Faith and Credit shall be given in each State to the public acts, records and judicial proceedings of every other State' but also provides that 'Congress may by general laws prescribe the manner in which such Acts, Records and Proceedings shall be proved, and the effect thereof.' Congress has exercised that power. By the Act of May 26, 1790, c. 11, 28 U.S.C. 687, Congress has provided that judgments 'shall have such faith and credit given to them in every court within the United States as they have by law or usage in the courts of the State from which they are taken.' Chief Justice Marshall stated in *Hampton* v. *McConnel*, 3 Wheat. 234, 235 [4 L.Ed. 378], that 'the judgment of a state court should have the same credit, validity and effect in every other court in the United States, which it had in the state where it was pronounced, and that whatever pleas would be good to a suit thereon in such state, and none others, could be pleaded in any other court in the United States.' That view has survived substantially intact. *Fauntleroy* v. *Lum*, 210 U.S. 230 [28 S.Ct. 641, 52 L.Ed. 1039]. This Court only recently stated that Art. IV, Sec. 1 and the Act of May 26, 1790 require that 'not some, but full' faith and credit be given judgments of a state court. *Davis* v. *Davis*, 305 U.S. 32, 40 [59 S.Ct. 3, 83 L.Ed. 26, 118 A.L.R. 1518]. Thus even though the cause of action could not be entertained in the state of the forum either because it had been barred by the local statute of limitations or contravened local policy, the judgment thereon obtained in a sister state is entitled to full faith and credit. See *Christmas* v. *Russell*, 5 Wall. 290 [18 L.Ed. 475]; *Fauntleroy* v. *Lum, supra; Kenney* v. *Supreme Lodge*, 252 U.S. 411 [40 S.Ct. 371, 64 L.Ed. 638], *Titus* v. *Wallick*, 306 U.S. 282, 291 [59 S.Ct. 557, 83 L.Ed. 653]. . . . *Cheever* v. *Wilson* (9 Wall. 108 [19 L.Ed. 604]) held that a decree of divorce granted by a state in which one spouse was domiciled and which had personal jurisdiction over the other was as conclusive in other states as it was in the state where it was obtained. *Atherton* v. *Atherton* (181 U.S. 155 [21 S.Ct. 544, 45 L.Ed. 794]) held that full faith and credit must be given a decree of divorce granted by the state of the matrimonial domicil on construc-

tive service against the other spouse who was a non-resident of that state.''

Again the court says: ''It is objected, however, that if such divorce decrees must be given full faith and credit, a substantial dilution of the sovereignty of other states will be effected. For it is pointed out that under such a rule one' state's policy of strict control over the institution of marriage could be thwarted by the decree of a more lax state. But such an objection goes to the application of the full faith and credit clause to many situations. It is an objection in varying degrees of intensity to the enforcement of a judgment of a sister state based on a cause of action which could not be enforced in the state of the forum. Mississippi's policy against gambling transactions was overridden in *Fauntleroy* v. *Lum, supra,* when a Missouri judgment based on such a Mississippi contract was enforced by this Court. Such is part of the price of our federal system.''

Finally the court concludes by saying: ''So when a court of one state acting in accord with the requirements of procedural due process alters the marital status of one domiciled in that state by granting him a divorce from his absent spouse, we cannot say its decree should be excepted from the full faith and credit clause merely because its enforcement or recognition in another state would conflict with the policy of the latter.''

We therefore hold that when the State of Rhode Island, acting in accord with its laws, established through valid adoption proceedings the status of adopted child and adoptive parent between decedent herein and her uncle, full faith and credit must be given to such decree and the status thereby created must be recognized by the State of California, notwithstanding a claimed conflict with the announced policy of the latter state.

The next finding of fact made by the court and now under attack by appellants on this appeal reads as follows: ''That at the time of her death John F. Morris was not the lineal ancestor of Winifred R. Morris, within the meaning of that term as used 'in Section 4, subdivision (1) of the Inheritance Tax Act of the State of California then in effect.''

The pertinent portion of subdivision 1, section 4, of the Inheritance Tax Act of 1935 (Stats. 1935, p. 1266; Deering's Gen. Laws, 1937, Act 8495) of the State of California, and upon which the foregoing finding was predicated, provides: ''(1)

Where the person or persons entitled to any beneficial interest in such property shall be the husband, wife, lineal ancestor, lineal issue of the decedent or any child adopted as such in conformity with the laws of this State, or any child to whom such decedent for not less than ten years prior to such transfer stood in the mutually acknowledged relation of a parent (provided, however, such relationship began at or before the child's fifteenth birthday, and was continuous for ten years thereafter), or any lineal issue of such adopted or mutually acknowledged child, at the rate. . . . "

It is at once apparent that before John F. Morris may be taxed at the rates mentioned in subdivision 1, section 4, of the just quoted act and be entitled to the preferment incident thereto it must be determined that he is a lineal ancestor of the deceased adopted daughter, Winifred R. Morris, which respondent contends he is not and with which contention the trial court agreed. Respondent maintains that "lineal" means descent from an ancestor, hence, family, race, stock; that "lineal" is that which subsists only between persons of whom one is descended in a direct line from the other, as between a son, father, grandfather, great grandfather, and so upward in the direct ascending line, or between son, grandson, great grandson, and so downward in the direct descending line. In other words, that lineal consanguinity means blood relationship. Respondent's claim in this regard might be summarized by saying that when the word "lineal" was used by the Legislature in subdivision 1, section 4, of the Inheritance Tax Act it was used in the sense of consanguinity or relationship by blood, which can come about only by natural means and not by artificial means, such as "statute made" relationships in the form of adoptions; that when, therefore, the Legislature speaks in the aforesaid act of "lineal ancestor" it means one who is in the direct line of ascent from the deceased; that is, a natural father or mother, natural grandfather or grandmother, and so on up in the direct ascending line. We are asked to hold that notwithstanding section 228 of the Civil Code of California, which provides that after adoption the adoptive parent and the adopted child shall sustain towards each other the legal relation of parent and child, and have all the rights and be subject to all the duties of that relation; and section 257 of the Probate Code, which declares that the person adopting succeeds to the estate of an adopted child the same as a natural

parent, that it was intended notwithstanding to restrict the favored class only to ancestors by blood in the direct ascending line. While undoubtedly it is true that the Legislature lacks the power to infuse into the parties to an adoption the element of blood relationship, the lawmakers certainly do have the power to confer upon parties to an adoption all rights, privileges and obligations enjoyed by or reposing in natural parents and children. In fact, the above mentioned section of the Inheritance Tax Act specifically provides in relation to "lineal issue of the decedent" that children by adoption, children by acknowledgment and the issue of such children shall enjoy the same preferment in the matter of tax as shall issue of the blood." While conceding this, and apparently not challenging the legality or validity of such legislative action, respondent argues that it was intended to exclude ancestors by adoption, since there was not added to the words "lineal ancestor" any reference to ancestors by adoption. Having expressly included adopted children, acknowledged children and their heirs in the preferred class, respondent argues that by failing to provide specifically that adoptive ancestors shall be so preferred, the maxim *expressio unius est exclusio alterius* applies and requires a holding by us that a lineal ancestor, as the term is used in subdivision 1, section 4, above mentioned, is restricted to one by blood in the direct ascending line and not one who became an ancestor by adoption.

The most important duty devolving upon a court in the construction of a written instrument, whether the same be a constitution, statute or a contract, is to discover the true meaning of the instrument and to glean therefrom the purposes and objects of the same (*Perry* v. *Gross,* 172 Cal. 468 [156 P. 1031]; *Fairman* v. *Mors,* 55 Cal.App.2d 216 [130 P.2d 448]). By the mandate of section 1858 of the Code of Civil Procedure there is enjoined upon courts in the construction of statutes the duty to ascertain and give effect to the legislative intent. We are therein admonished to refrain from any unwarranted invasion of the functions of the lawmaking body; that if for any reason amendment or abrogation of a statute is desired, resort must be had to the Legislature, which alone has power to modify or abolish statutory rules, and not to the courts, whose duty is simply to declare the law. The last cited section reads: "In the construction of a statute or instrument, the office of the judge is simply

to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all.''

With these rules in mind we proceed to a consideration of the legislative intent and objectives as manifested by the terminology of subdivision 1, section 4, of the Inheritance Tax Act of 1935. The difficulty with respondent's contention in reference to the statute now under consideration is that if we adopt the interpretation urged by respondent we must hold that the Legislature intended by the language used to confer upon adopted children certain rights and privileges denied to adoptive parents; and this in the face of the reciprocal rights, privileges and obligations granted and imposed upon both the adopted children and the adoptive parents. We are persuaded that when the Legislature exercised the diligence it did in stating expressly, specifically and in detail, provisions regarding adopted children but refrained from such reference to adoptive parents, it was intended that the latter be regarded as being in the legal category of ''lineal ancestors,'' as that phrase is used in the Inheritance Tax Act. Otherwise, the child adopted and the adoptive parent would not sustain toward each other ''the legal relation of parent and child'' and ''have all the rights and be subject to all the duties of that relation'' (§ 228, Civ. Code; § 257, Prob. Code). In view of the language of the last cited code sections we are constrained to hold that the right of the adoptive parent to succeed to the estate of a deceased adopted child must be included. It must be assumed that when the Legislature provided in the Inheritance Tax Act that the preferred class should include ''lineal ancestors'' the lawmakers were cognizant of these code sections; and that while adoption does not make the person adopted one of the blood or of the issue of the adoptive parent, it does make such parent capable of inheriting the same as if he was an ancestor by blood. Our view in this regard is strengthened by reference to judicial interpretation of related statutes. A situation somewhat similar to the one at bar was presented in the case of *Estate of Winchester*, 140 Cal. 468 [74 P. 10], which involved the question of whether or not legacies for the benefit of the children of an adopted daughter, as made by the will of the adoptive parent (an adoptive grandparent) were subject to

the collateral inheritance tax of 1893, and wherein the court held that the children of an adopted daughter were not collateral but were lineal descendants of the adopting parent. The reasoning and conclusion arrived at in that case were considered and approved in *Estate of Hebert*, 42 Cal.App. 2d 664, 665, 666 [109 P.2d 729]. It is therefore our conclusion that by the well-settled current of authority and when the provisions of the Inheritance Tax Act are construed in *pari materia* with the hereinabove quoted applicable sections of the Civil and Probate Codes, it was intended by the Legislature in adopting the tax act that an adoptive father was to be classified as a ''lineal ancestor'' within the meaning and purview of subdivision 1, section 4, thereof.

Finally respondent contends that subdivision 1, section 4, of the Inheritance Tax Act giving preferences in the matter of rates to those included therein should be liberally construed in favor of the state in the same manner as in the case of an exemption. It is firmly established in our law that statutes imposing taxes ''are to be strictly construed in favor of the individual and against the state,'' while exemptions from taxation are to ''be construed liberally in favor of the state and strictly as to those claiming the benefit of such exemptions'' (*Estate of Steehler*, 195 Cal. 386, 389, 396 [233 P. 972]). Appellants, while not denying the rule of strict interpretation of statutory exemptions in favor of the state and strictly as to claimants for such exemptions, and not opposing the authorities urged in its support, insist that the rule is not to be given application to the portion of the Inheritance Tax Act with which we are here concerned. We find ourselves in accord with this claim, because, as appellants point out, and we think correctly, in construing subdivision 1, section 4, of the Inheritance Tax Act, we are not dealing with exemption clauses in the act, but are confronted with the question as to whether the section in fact imposes the greater rather than the less or preferred tax upon a lineal ancestor of the decedent. In other words, subdivision 1, section 4, imposes and fixes the rate of taxation and its provisions cannot be viewed in the light of establishing exemptions. It is section 6 of the Inheritance Tax Act that deals with and provides for the allowance of exemptions (*Estate of Steehler, supra*).

The order appealed from is reversed and the cause remanded with directions to the court below to enter its order

sustaining the objections filed by the administrators and directing that the total amount of inheritance tax due to the State of California out of this estate is $37,415.94.

York, P. J., and Doran, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied March 18, 1943. Traynor, J., voted for a hearing.