Meng v. Meng

430

*Fred C. Gartner*, for libellant.

*Harrison G. Kildare*, for respondent d. b. e.

GORDON, JR., P. J., July 7, 1943.—This bill in equity is brought by a wife to restrain her husband from prosecuting an action in divorce in a foreign jurisdiction, and the case is before us upon a petition and rule by the defendant husband for a preliminary determination of our jurisdiction under Equity Rule 29 (Act of March 5, 1925, P. L. 23, 12 PS §§672-675).

From the pleadings and evidence presented at the hearing of the petition, the following facts appear: On February 27, 1937, Dr. Frederick William Meng, defendant, started an action for divorce in this court against his wife, plaintiff, as of March term, 1937, no. 639, charging cruel and barbarous treatment and indignities to the person. In due course the case was referred to a master, and after 13 hearings, in which upward of 450 pages of testimony were taken, defend-

ant (petitioner here) discontinued the action by leave of court on December 26, 1939. On January 27, 1943, defendant went to the El Cortez Hotel in Reno, County of Washoe, Nevada, and on March 15th, approximately six weeks after he arrived in Reno, started another action for divorce against his wife in that jurisdiction. Mrs. Meng, who had remained here, received notice on March 17, 1943, of the institution of the divorce action in Nevada. No other form of service of process in the Reno action has been made upon her; nor has she appeared in that proceeding, either in person or by attorney. Having received this constructive notice of the Reno action, plaintiff filed the present bill in equity on April 7, 1943, in which, alleging that her husband is prosecuting the divorce action in Nevada for the purpose of evading the laws of Pennsylvania under which he has no lawful ground of divorce against her, that his pretended residence at the El Cortez Hotel in Reno is not his true domicile and is fictitious, false, and fraudulent as to her and her rights, and that she will suffer irreparable damage if he is permitted to continue with that suit, she prays for an injunction restraining the further prosecution of it by him.

Upon the filing of the bill and the presentation of injunction affidavits, we fixed May 6, 1943, for a hearing on the prayer for a preliminary injunction, and also granted a temporary injunction against defendant, restraining him from proceeding with the Nevada action until the date fixed by us for that hearing. At the same time we made an order authorizing plaintiff, in addition to making the usual and proper service of the bill, injunction, and notice of the hearing upon defendant at his alleged domicile in Philadelphia, to serve them upon him and his attorneys in Nevada. Plaintiff was unable to secure personal service upon defendant in Reno because he could not be found at the hotel which he claims as his residence in that State, but service was effected upon his attorneys there, and

he was also served here in the manner required by law for service of process upon residents of Pennsylvania.

That defendant received actual and timely knowledge of the service of the process here is conceded of record by his counsel, whom he had retained, when he went to Reno, to represent him in matters arising locally in his affairs. This is confirmed also by the filing of the present motion to set aside the service for want of jurisdiction. Notwithstanding the knowledge of issuance of the injunction thus acquired by defendant, he proceeded in direct violation of it with his divorce action in Reno, and on April 20, 1943, procured from the Nevada court a final decree of divorce from plaintiff on the ground that "for more than three consecutive years" he and his wife had "lived separate and apart without cohabitation".

On the same day on which the Nevada court granted a divorce to defendant, he appeared de bene esse in this proceeding, and secured the rule now before us to determine our jurisdiction preliminarily. Plaintiff made answer thereto, and the rule came on for hearing on May 6, 1943. The rule challenges our jurisdiction upon two grounds. It is contended, first, that, as there was no personal service of process upon defendant in Reno, and as he had abandoned his Philadelphia domicile in January of this year, thus rendering the service here ineffective, we have not acquired jurisdiction over his person, and hence that we were without authority to issue the preliminary injunction against him; and, second, that even if his domicile had been here at the time of service of the process by the sheriff of Philadelphia there were such irregularities in the manner of that service as to render it void and ineffective.

The challenge of our jurisdiction because of the alleged irregularities in the service here is without merit. The witnesses called by defendant on this point testified that the deputy sheriff who made the service at 1354 Orthodox Street, where defendant had been

domiciled, handed the papers to his stepmother, Mrs. Elizabeth I. Meng, who owned and lived on the premises, and from whom he rented his living apartment and professional offices. Mrs. Meng testified that she refused to accept the papers from the writ server, whereupon he threw them at her and they fell to the ground at her feet, that she "picked them up and threw them back and he threw them back to me [her] again", that she "left them lying there" in the yard, and that shortly thereafter another witness, Mrs. Pearl E. Krieger, a common friend of Mrs. Meng and defendant, picked them up, informed her of their nature, and delivered them on the following day to defendant's attorneys in Philadelphia. This version of the service differs but slightly from that of the deputy, William Orrell, and plaintiff, who had accompanied him in order to identify Mrs. Meng, upon whom service was made. These witnesses testified that the stepmother threw the papers at her (the wife), who on her part picked them up and threw them back at the stepmother. As this difference in the two versions of the transaction is of no substantial importance, we do not think it is necessary to pass upon their respective accuracy. If it were, however, we would unhesitatingly find that the incident occurred substantially as testified to by the deputy sheriff and plaintiff.

Service of process does not depend upon the willingness of the person served to accept it. All that is required is that it shall be handed to a proper person at the appropriate place for such service. No theatrical tossing about of the documents or petulant refusal to receive them will invalidate a service which is otherwise good and in compliance with law. When the deputy sheriff tendered the papers to Mrs. Meng, who was not only an adult relative, but also the owner and manager of the premises, a valid service was thereby effected, if the place was, in fact, defendant's legal domicile, and

nothing Mrs. Meng did with them thereafter could render that service abortive.

Since the bill avers the Orthodox Street address to be the true legal domicile of defendant, and that he had gone to Nevada to prosecute his divorce action, plaintiff was justified, as a cautionary measure, in securing authority from us under Equity Rule 27 to make the additional or supplementary service of the bill and injunction upon defendant and his attorneys in that State. The failure to make that service, however, does not deprive us of jurisdiction over defendant, if the service here is good and sufficient to bring him within it. This service is justified by Equity Rules 27 and 91, the latter of which provides: "In all cases where these rules do not apply, the practice shall conform, as nearly as may be, to the practice in courts of law in regard to the particular matter. . . ."

Service on the law side of the court is governed by the Act of July 9, 1901, P. L. 614, sec. 1, 12 PS §291, which provides that process at law may be served by handing it to an adult member of defendant's family at his place of residence, or the family with which he resides, or the manager, etc., of the apartment house or lodging place where he resides. If the stepmother in this case is not properly to be viewed as a member of defendant's family, or that with which he resides, she was at least the owner and manager of the place where he resided and maintained professional offices. The service upon him was, therefore, regular and valid, if his domicile at the time of service was at that address, and the fact that he was temporarily out of the city when service was made is immaterial: Second National Bank of Altoona v. Gardner, 171 Pa. 267.

This brings us to a consideration of the principal contention of the defendant, namely, his claim that, no personal service having been made upon him in Nevada, the service here, however regular it may otherwise have been, was ineffective to subject him to our juris-

diction, because when it was made he had already moved his permanent residence to Reno and the Orthodox Street address in Philadelphia was no longer his legal domicile.

While the petition does not directly challenge the power of courts of one jurisdiction in proper cases to restrain the prosecution of an oppressive action in those of another State, it may be noted in passing that this field of equity jurisdiction is not open to doubt.[1] As stated by Mr. Justice Frankfurter in a dissenting opinion in Miles et al. v. Illinois Central R. R. Co., 315 U. S. 698, 720, 721: "Injunctions by the chancellor against suits in other courts go back to at least the late sixteenth century.[2] . . . This doctrine of equitable power has been universally accepted by American courts. . .".[3] And in this State the right has been recognized frequently.[4]

Although the right to equitable relief in cases of this nature is well settled, it will be granted cautiously, and the plaintiff's right to it must be clear. It is true that such a decree operates only upon the litigant, and not upon the court of the foreign jurisdiction involved. Yet it smacks of indirect interference with the jurisdiction of another court, and hence great caution must be observed in exercising it: Delaware, Lackawanna &

---

[1] Streitwolf v. Streitwolf, 181 U. S. 179; Baltimore & Ohio R. R. Co. v. Kepner, 314 U. S. 44; Cole v. Cunningham, 133 U. S. 107; Young v. Young, 16 D. & C. 287.

[2] Cliffe v. Turnor, Cary 83 (1579); Chock v. Chea, Cary 83 (1579); Tanfield v. Davenport, Tot. 114 (1638); Trinick v. Bordfield, Tot. 117 (1638).

[3] See also Restatement of Conflict of Laws, §96; 28 Am. Jur. 389, §204.

[4] Delaware, Lackawanna & Western R. R. v. Ashelman et ux., 300 Pa. 291; Schmaltz v. York Manufacturing Co., 204 Pa. 1; Young v. Young, 16 D. & C. 287; Pittsburgh & Lake Erie R. R. Co. v. Grimm's Administrator, 28 Dist. R. 419.

Western R. R. Co. v. Ashelman et ux. (note 4, ante). But when "the purpose of bringing the suit in a foreign jurisdiction is to evade the laws of one's own state, and the laws of the foreign jurisdiction are oppressively different from those of the home state, an injunction may be granted . . .": id., p. 296. As stated more generally in the Restatement, such a decree will readily be issued ". . . when acts are threatened which subject the plaintiff to irreparable damage or when the balance of convenience and fairness require . . .": Restatement of Conflict of Laws, §96, comment (a).

It is manifest that the case before us falls well within the above rule. The effects of a final decree in divorce on the rights of a wife are radical and far-reaching; it deprives her of the right of support,[5] extinguishes her dower rights, forces upon her a complete change in her social status, and profoundly alters the whole environment of her life. To protect these important rights and to save herself from the notoriety and humiliation of divorcement, she is not obliged to follow her spouse at great or prohibitive expense to every foreign and perhaps distant State in which he chooses to set up a fictitious residence, and where she might well be deprived of the effective use of important witnesses to testify in her behalf, or even be rendered powerless fully and adequately to defend herself. Plaintiff is, and always has been, a citizen and resident of Pennsylvania. Her rights and her status are as much the object of the solicitous concern and protection of its laws as the domestic affairs of a resident of Reno are of the laws of Nevada (see Williams et al. v. North Carolina, 317 U. S. 287), and to the courts and judicial processes of her domicile she is entitled to turn for the preservation and enforcement of those rights. Rules governing the conflict of laws work both ways, and the same considerations of sovereign rights and interests

---

[5] Commonwealth ex rel. v. Kurniker, 96 Pa. Superior Ct. 553.

which induced the decision of the Supreme Court of the United States in Williams v. North Carolina demand the recognition of this Commonwealth's predominant interest in the marital rights and status of this plaintiff, one of her own citizens, and require Nevada to give full faith and credit to the lawful judgments and decrees of the courts of Pennsylvania.

The service of our process by the sheriff at the Orthodox Street address of defendant was valid if that address was in fact his true legal domicile. His assertion to the contrary in the petition before us is not proof of the fact, but is a mere matter of pleading by which the jurisdictional issue is tendered for determination. This issue having been raised by defendant, the burden rests upon him to establish, by competent and sufficient evidence, that, when the service was made, he had already changed his domicile from the place at which he admits it had been at least until January 27, 1943. Domicile persists in law, and, once established, is presumed to continue until a new one is acquired.[6] The fact, which plaintiff must concede, that defendant has been living at the El Cortez Hotel in Reno is not conclusive of his domicile, for residence and domicile are clearly distinguishable. Residence in fact, coupled with the purpose to make the place of residence one's home, are the essential elements of domicile.[7]

To meet the burden of proving a change of domicile, defendant introduced the testimony of three witnesses (two friends and his stepmother) and also offered in evidence the divorce decree of the Nevada court, which he had secured in violation of our injunction and in which that court found that he had been a bona fide resident of Nevada since the end of January 1943. The

---

[6] Pusey's Estate, 321 Pa. 248; Barclay's Estate, 259 Pa. 401.

[7] Dorrance's Estate, 309 Pa. 151; Raymond v. Leishman, 243 Pa. 64; Texas v. Florida et al., 306 U. S. 398; Restatement of Conflict of Laws, §15; Goodrich on Conflict of Laws 30.

admissibility and effect of this latter piece of evidence will be discussed later. The oral testimony of the three witnesses, restricted by our exclusion for obvious reasons of the self-serving declarations made to them by defendant, when he went to Reno, respecting his intention to change his domicile, can be said to establish only that he went to Reno in January, that in their opinion he did so for reasons of health, and that, according to one of these witnesses who met him there and who seems to have gone West at the same time and for the same purpose, defendant's health appeared to improve while he was there.

The only logical inference to be drawn from this testimony is that defendant went West for a purpose, and that upon the accomplishment of whatever purpose or purposes he had in mind he could reasonably be expected to return to his home in Philadelphia. On cross-examination, two of the witnesses admitted that he left his office equipment and living quarters undisturbed at his Philadelphia address, with his professional sign still hanging in the office window where it remained until removed by his stepmother on April 30th, a few days before the hearing of this rule. The uncorroborated explanation offered by the stepmother for these mutely eloquent circumstances, namely, that defendant owed her money and left the office equipment as security for the debt, and that, although he had instructed her to remove the sign when he left the city, she did not remove it because she had been "hoping he would change his mind" and return to Philadelphia, is neither probable nor convincing. Indeed its implications are all contrary to the general purpose for which it was offered.

No evidence was offered to show the nature of the malady from which defendant is supposed to be suffering, or in what respect the climate of Reno would be more conducive to a restoration of his health than that of Philadelphia. And even had the health motive been

established, it would have furnished no necessary basis for inferring an intent to change domicile. It is a "well settled rule that absence from a place of legal residence, for purposes of health or other unavoidable necessity, will not result in a loss of that domicile." [8] Motive is necessarily relevant to intent, but the strength of the relation obviously depends on the nature of the motive; and in the circumstances of the present case the obvious motive for defendant's going to Nevada is almost conclusive of a want of intent to change his permanent residence, however vigorously he may assert the contrary. It was no mere coincidence that, having abandoned his efforts to secure a divorce from his wife in the jurisdiction of their common and lifelong domicile, defendant selected the congenial and salubrious atmosphere of a place notorious among divorce seekers for the cure of his alleged ill-health. The evidence is utterly devoid of those acts and circumstances which always accompany the uprooting of a home and a genuine migration to a distant land. The man who moves permanently from Pennsylvania to Nevada or California ships to his new home, or otherwise disposes of, his personal and household effects—he does not walk out and abandon them; he surrenders the lease of his house or, if he owns it, arranges to offer it for sale or rent; he sells his business or professional practice; he closes out his local bank account and transfers it to one at his new residence, where he also secures work and makes new business or professional connections. Some or all of these things and the countless other acts that inevitably accompany a domiciliary removal the bona fide changer of a domicile performs, and can readily prove. Yet this defendant failed to show that he performed a single one of such acts, notwithstanding the fact that they would reveal and corroborate his

---

[8] Dorrance's Estate, supra, p. 170; see also 1 Beale, Conflict of Laws (1935 ed.) 172.

possession of permanent residential intention in going to Reno. On the other hand, the things which he showed he actually did suggest only a temporary visit for a definite and limited purpose. These, taken in conjunction with the omissions in his proofs and his significant failure to offer himself as a witness to his own intentions, completely negative his claim that when he went to Nevada he abandoned his residence here and took up a permanent one there. Common experience and reason reject such a conclusion, and intellectual integrity spurns it.

The only other evidence offered by defendant in support of his motion to dismiss the bill and injunction for want of jurisdiction is the decree of divorce granted to him by the Nevada court on April 20th, in which it finds, inter alia, that he "was at the time of the commencement of this [that] suit, and for more than six weeks prior thereto, continuously has been, and still and now is, an actual and bona fide resident of, and domiciled within, the County of Washoe, State of Nevada."

This decree was apparently offered in evidence as a binding adjudication of the location of his domicile by another State to which, it is contended, we must give full faith and credit under the decision of the United States Supreme Court in Williams et al. v. North Carolina, supra. With this contention we cannot agree. We think it is clearly inadmissible for a number of reasons. It was secured subsequent to the date on which our jurisdiction attached through the service of our process in the case. Whatever its effect may be in Nevada as a conclusive adjudication between the parties of the defendant's residential status in that State, it neither is, nor pretends to be, an adjudication of his status here, under the laws of Pennsylvania. The right to decide our own jurisdiction rests, in the first instance at least, with us; and, jurisdiction to determine that

question for ourselves, as well as all factual disputes upon which it depends, having attached by the impetration of the suit, we cannot thereafter be ousted from it by a decision of the same question by the courts of another jurisdiction.

In addition, to give extraterritorial effect to a judgment on the a priori jurisdictional question upon which its validity depends, would validate every void judgment by making each court the exclusive arbiter of its own jurisdiction, and thereby render the citizen impotent to protect himself from capricious and ultra vires judicial acts. The "full faith and credit" clause of our Federal Constitution was never intended to produce such a result, and has been consistently held to operate only upon judgments rendered against parties over whom a court has acquired jurisdiction by due legal process. It is well settled that, "Where a judgment rendered in one state is challenged in another, a want of jurisdiction over either the person or the subject matter is of course open to inquiry." [9] The decision in Williams et al. v. North Carolina, supra, is not pertinent to the question here under consideration, since the jurisdiction of the Nevada court over the parties in that case was held either to have been assumed or not to have been effectively raised, and the majority opinion expressly recognized that it was not dealing with a case involving a false and fraudulently acquired domicile.

For the foregoing reasons, we are of opinion that the decree of divorce from the plaintiff secured by defendant in Nevada is not admissible in this proceeding as proof in the nature of res adjudicata of his asserted domicile in that State. Under the general principles of comity between States, however, the judg-

[9] Milliken et al. v. Meyer, Admx., 311 U. S. 457, 462; Grover & Baker Sewing Machine Co. v. Radcliffe, 137 U. S. 287; Adam v. Saenger et al., 303 U. S. 59; Goodrich, op. cit. supra, pp. 151 et seq.

ments of one State may be received and recognized by the courts of another, and authority for so admitting the decree here offered is to be found in the Act of Congress of March 27, 1804. [10] When so received, a foreign judgment is only presumptive proof of the acts recited in it, and will be considered and weighed in conjunction with all the other evidence in the case.[11] Viewed in this light, the Nevada decree does not help defendant's case. Its presumptive effect is completely rebutted by the overwhelming weight of the other evidence presented by defendant, which we have already discussed. We do not know, nor do we think it important that we should know, the nature or extent of the evidence presented to the Nevada court on which it predicated its finding that defendant is domiciled there. But we can be sure either that it was not the same as has been presented to us, or that the therapeutic properties of the climate of our sister Commonwealth are marvelously stimulative to credulity. However that may be, defendant cannot demand that we receive in evidence a judgment procured in direct defiance of our decree prohibiting him from getting it. With that eliminated, his own evidence alone forces the conclusion, and we find, that at the time of the service of the bill and injunction in this case his true and bona fide domicile was at 1354 Orthodox Street, in the City of Philadelphia; that when he went to the El Cortez Hotel in Reno, Nevada, he did so without any intent to abandon his said domicile here, that he has failed to establish that he has changed his said domicile; and hence, that the service of said process at his said Orthodox Street residence was good and valid in law and

[10] Act of March 27, 1804, c. 56, sec. 2; 2 Stat. at L. 299, 28 U. S. C. §687.

[11] Shilling v. Seigle, 207 Pa. 381; Morgan v. Neville, 74 Pa. 52; Reber v. Wright et al., 68 Pa. 471; 31 Am. Jur. 79, §415; 2 Beale, op. cit. supra, p. 1371.

operated to bring him within our jurisdiction in this case.

In conclusion, it should be noted that we do not have before us at this time the question of the validity and effect of the Nevada decree as a binding divorcement of the parties to which we are required to give full faith and credit under the principles laid down in Williams et al. v. North Carolina, supra. The case has not yet reached the point where that question arises. Our injunction imposed upon defendant a personal incapacity to prosecute the action in Reno until the final determination of this case. An incapacity which is special and individual adheres to the person subject to it wherever he goes, and it may well be that, although our injunction does not operate directly upon the Nevada court, that court was bound, under the full faith and credit clause of the Federal Constitution, to recognize and give effect to it as regards the enjoined defendant, and hence that a divorce procured in such circumstances would have no validity outside of Nevada, and might even be a nullity, revocable in that State itself. As we have said, however, that question is not now before us, and we therefore expressly refrain from reaching any definite conclusion upon it. We are at present concerned only with our jurisdiction over the defendant and the evidential and probative value and effect of the Nevada decree as it bears upon the jurisdictional question.

Accordingly, the rule before us is discharged, and the petition dismissed.