## UNITED STATES v. TWELVE ERMINE SKINS, etc.

### No. A-4538.

District Court, Alaska.
Third Div. Anchorage.
July 1, 1948.

Raymond E. Plummer, U. S. Atty., of Anchorage, Alaska, for plaintiff.

Cuddy & Kay, of Anchorage, Alaska, for defendant.

DIMOND, District Judge.

In the case of United States of America v. R. H. Gaier, motion by the government for new trial was filed and was argued sometime ago. The motion for new trial is based upon the alleged ambiguity and misleading nature of the instructions, the failure to give one instruction regarding the law as to the granting of a resident hunting license in Alaska, and the refusal of the Court to instruct a verdict in favor of the plaintiff and against the defendant.

The proof shows that the defendant, Rudolph Gaier, resided in Alaska for a considerable number of years, worked in various occupations and also trapped for the skins of fur bearing animals in several parts of the Territory. He left Alaska in the year 1933 and went to California. At first, according to his own undisputed testimony, he was engaged in work which had some connection with Alaska with the hope of establishing an airline either in Alaska or between the States and Alaska, but that soon terminated. After that he engaged in various types of employment having no connection with Alaska. After the outbreak of war he went overseas and worked for Pan American Airways, or some other air company, in Africa, stayed sometime in England and then returned to California and after a short period there came back to Alaska the summer of 1945.

He was absent from Alaska for the period of 12 years, approximately. He had no home or dwelling place of any kind in Alaska during that period. He does not even say that he had a cabin in the wilderness from which he operated for the purpose of trapping. When he left Alaska in 1933, so far as the evidence shows, he took everything which he owned with him. If he did leave anything it was only personal property of relatively slight value and so far as my recollection goes he does not testify to having left anything in Alaska when he departed for California in 1933.

He lived for a considerable period of time in Los Angeles, and while there he registered for elections on two occasions, the first time, as I recall, in 1936. He seems to have sworn to his affidavit of registration on the 15th day of July, 1936. A certified copy of that certificate has been put in evidence and it is marked on its face as cancelled by transfer to 966, which evidently refers to another election district, and that transfer was made on 9/13/39, according to the photostat copy which is undisputed.

On the 13th day of September, 1939, he made another affidavit of registration for voting. That was also cancelled. The mark of its cancellation is not entirely clear, but it does indicate that it was cancelled by reason of not having voted at some preceding general election. That cancellation is marked, however, in 1942— 12/30/1942—so I think it is a fair inference that he failed to vote in 1942 and, therefore, his certificate of registration was cancelled.

There is no definite positive proof, except for such inferences as may be drawn from the law, that he voted in California. A strong inference may be drawn from these certificates of registration and the endorsements thereon that he did so vote. The United States Attorney asserts that he voted in 1936 and 1938 and 1940, but that is an inference only that may be drawn from the evidence, and particularly from the certificates or affidavits of registration.

Now, in each of these affidavits the defendant swore that his residence was at the place indicated in the City of Los Angeles, California. Positive affidavits that he resided there. And that is not all: Before he went overseas he made an application for a passport. In that application he made oath that his permanent residence was at 1224 West 8th St., Los Angeles, California. This affidavit appears to have been made on September 19, 1941. He reg-

istered under the Selective Service Law and gave his address as Los Angeles, California. The registration card evidently does not require the registrant to state his place of residence as distinguished from address.

Near the close of the trial the defendant on cross examination was asked how long he had permanently resided in Alaska immediately prior to making application for the resident trapping license. A transcript of the reporter's notes on the subject reads as follows:

"Question:" by Mr. Plummer, "I call your attention to Plaintiff's Exhibits No. 2 and 3 and ask you to state how long you had resided continuously in Alaska immediately prior to the issuance of that license?"

Now, I may here interpolate and say the license referred to was the resident trapping license which he secured in 1946.

Counsel for defendant objected; the objection was overruled and the witness answered as follows:

"Well, from—let's see—September 13, '46—or from the middle of June, '45 to September 13, 1946—

"Mr. Plummer: The middle of June, 1945, to September 13, 1946? That is all."

On redirect examination by Mr. Cuddy we find the following:

"Mr. Gaier, in response to that question, where did you consider your residence—your home—prior to the date that was just asked you?"

That was objected to and the objection was overruled and the witness answered:

"Why, I considered Anchorage my home.

"Mr. Cuddy: And for how—did you consider any time after coming to Alaska in 1920 that you had abandoned your residence in Anchorage, Alaska? Answer: Well, I don't know about Anchorage.

"Question: Or Alaska? Answer: I always felt Alaska was my home.

"Question. Since 1920? Answer: Yes.

"Mr. Cuddy: That's all."

So, we have on the one hand the affidavits of the defendant that he actually resided in Los Angeles in 1936 and in 1939 and again in 1941. In fact, the affidavit made to secure a passport has the words: "Permanent residence" in heavy type so as to invite the attention of the affiant to it. And then upon examination when he was asked how long he permanently resided in Alaska before September, 1946, he said he had resided here since the middle of June, 1945. I do not give great weight to that last declaration because a witness may, under the stress of examination or in confusion, say a thing that he does not really mean or answer a question that he does not really understand, although the very point to be decided here was how long he had permanently resided in Alaska before September 13, 1946, and he said since June, 1945.

It appears that the United States Attorney believes the word "resided" does not mean "domiciled" and residence must be confined to the equivalent of abode or dwelling. Residence, according to the use made of it—the context, the circumstances and, of course, the decisions of the courts of appellate jurisdiction—may mean almost anything. We can find dozens, if not hundreds of opinions which say that residence, under certain conditions and circumstances, means dwelling place. To reside means to dwell, or to live, to use the ordinary term. One says that he lives in Alaska. It means that he dwells there. It does not necessarily mean that he has his home there or that his domicile is there. On the other hand, the word "residence," in many cases, particularly as respects taxation and divorce, has been held almost uniformly to mean domicile.

Now, the question is, what is the meaning of the word "domicile?" And the decisions of the courts vary greatly, even as to the meaning of domicile. The most concise definition, perhaps, can be found in Restatement of Conflict of Laws in Sec. 9 at Page 17 where we find the following and I quote:

"Domicil is the place with which a person has a settled connection for certain legal purposes, either because his home is there, or because that place is assigned to him by the law."

Hence, there may be two circumstances under which one may have a domicile in a place.

The word "domicile" has been recently and on several occasions, defined by the Supreme Court of the United States. In the case of State of Texas v. Florida, reported in 306 U.S. 398, at page 399, 59 S. Ct. 563, 576, 830, 83 L.Ed. 817, 121 A.L.R. 1179— and I will refer to that case later for other reasons—we find the following:

"Residence in fact, coupled with the purpose to make the place of residence one's home, are the essential elements of domicile."

In a dissenting opinion in the case of Williams v. North Carolina, 317 U.S. 287, at page 322, 63 S.Ct. 207, 225, 87 L.Ed. 279, 143 A.L.R. 1273, Justice Jackson defined "domicile" as follows:

"It is the place, and the one place, where he has his roots and his real, permanent home."

In neither of these definitions is reference made to the fact that domicile may be assigned to a person by law, and yet a moment's reflection will show that to be a necessary part of the definition.

■■ Now, the first question to be answered is what did the legislature—in this case Congress—mean in using the words "reside," "residence," "resided," and "resident" in the Alaska Game Law? The Game Law defines almost every other term used in the law, but it does not define "residence"; it does not define "resided" or "resident." The suggestion was made, as I recall, during the trial that to reside in a place did not necessarily mean it was one's residence. However, I think that contention can not be sustained in reason for it seems that the words "reside" and "resided" and "residence" are linguistic equivalents, substantially, making allowance for the fact that one of the words is a noun and the others verbs. If one resides in a place that place is his residence. To say anything else would be to indulge in some fancy acrobatics in the science of semantics in which an attempt is made to assign to words meanings that are contrary to their derivation and inner structure and commonly accepted sense.

■■ It is not so easy to decide what Congress did mean by "residence," whether it meant a dwelling place or whether it meant a domicile. Evidently, so far as I am able to discern, it was the purpose of Congress by using the words "reside," "resided" and "residence" and "resident" to require that those who held resident licenses should have their domiciles in Alaska. I think the purpose of the law was to give some measure of protection or advantage to those who had their homes in Alaska against those who might temporarily dwell here or who might visit in Alaska even for the length of time which is the statute of limitations under the Alaska Game Law. Therefore, my present construction is that the word "residence" as used in the Alaska Game Law means "domicile," and one who has resided in Alaska for the period of three years, which is the requirement of the law and regulations to secure a resident trapping license, must have had his domicile in Alaska for that time.

But that does not settle the question. We have to go further: Even assuming, as we must, that Rudolph Gaier had his domicile in Alaska from 1920 to 1932, did he have his domicile in Alaska three years immediately prior to September 13, 1946? One piece of evidence that bears upon it is the fact that when he returned in 1945 he first sought to obtain a resident hunting license and the authorities of the Alaska Game Commission with whom he discussed the subject said he was not a resident of Alaska; and at that time, in 1945, he finally made application for and received a non-resident trapping license. He was no better off in 1946 because if he was not a resident, if he was not entitled to a resident license, in 1945, he was not entitled to a resident license in 1946.

[6] The Supreme Court in other cases than those mentioned has had something to say about domicile. Some of the cases arose under the citizenship requirements for bringing and maintaining suits in the federal courts. The Supreme Court has held that citizenship in such a case means domicile. If a man is a citizen of the State he must have his domicile in the State; and

if he has his domicile in the state he is a citizen of the state.

Restatement, from which I have heretofore quoted, has something else to say on the subject of domicile, and I quote further:

"If a man establishes a new dwelling-place, but never abandons the intention of returning to the old dwelling-place as his only home, the domicil remains at the old dwelling-place."

That is in Sec. 18 on Page 38 of Restatement of Conflict of Laws.

And again in Sec. 23 at Page 47 of the same work we find the following:

"A domicil once established continues until it is superseded by a new domicil."

■ In the case of Mitchell v. United States, decided in 1874, reported in 21 Wall. 350, at page 353, 88 U.S. 350, at page 353, 22 L.Ed. 584, the Court said, and I quote:

"A domicile once acquired is presumed to continue until it is shown to have been changed. Where a change of domicile is alleged the burden of proving it rests upon the person making the allegation."

And further along in the same opinion we read:

"Among the circumstances usually relied upon to establish the animus manendi are: Declarations of the party; the exercise of political rights; the payment of personal taxes; a house of residence, and a place of business."

In this case we have the declarations of Rudolph Gaier, made on three separate occasions, that he was a resident of the State of California. The exercise of political rights: He did exercise political rights. There is no proof that he paid any personal taxes, or that he had any house of residence in Los Angeles other than in a hotel or rooming house or boarding house.

In the case of Shelton v. Tiffin, 6 How. 163, at page 185, 47 U.S. 163, at page 185, 12 L.Ed. 387, we find the following:

"On a change of domicile from one State to another, citizenship may depend upon the intention of the individual. But this intention may be shown more satisfactorily by acts than declarations. An exercise of the right of suffrage is conclusive on the subject; but acquiring a right of suffrage, accompanied by acts which show a permanent location, unexplained, may be sufficient."

The latest declaration of the Supreme Court that I have been able to find on the subject, except as to some divorce cases, particularly Williams v. North Carolina, is the case of State of Texas v. Florida, reported in 306 U.S. 398, 59 S.Ct. 563, 830, 83 L.Ed. 817, 121 A.L.R. 1179. The opinion was given in 1939. This involved the estate of E. H. Green, deceased. The decedent's estate, according to the opinion, was appraised at something more than $42,000,000. It appears from the undisputed facts that he had resided in Texas continuously between the years 1892 and 1911 and his domicile was there. He had no other home. Between 1911 and 1921, a period of 10 years, he went twice a year to Texas and he always voted there. Never in his life did he vote in any other place than Texas. Up until the day of his death he claimed that he was a resident of Texas and that he did not reside elsewhere. However, he had a dwelling house in Florida. He had a place of dwelling in New York. He had an elaborate dwelling house and other buildings, which cost something like $6,000,000, in the State of Massachusetts, at which he spent slightly less than six months each year. Upon his death the States of Texas and Florida and New York and Massachusetts each sought to impose inheritance or succession taxes. If every state had succeeded in imposing all of the taxes that it claimed, the estate would have been insufficient to pay all of the taxes claimed, and consequently the State of Texas brought an original suit in the Supreme Court of the United States to determine the residence and domicile of the dead man.

He died in 1936. From 1922 to 1927 he made but one visit to Texas annually. He did not go to Texas after 1927, a period of nine years, except for one visit in 1935 for medical treatment. He never voted in Texas after 1921, although he always claimed residence there.

If his declarations and intentions counted for anything or could overcome the effect of his acts, then he was a resident of Texas, but the referee held, and the Supreme Court affirmed, that .he was a resident of the State of Massachusetts instead.

And in that connection, in addition to the paragraph I read a moment ago, which I now repeat: "Residence in fact, coupled with the purpose to make the place of residence one's home, are the essential elements of domicile," the Supreme Court had something further to say on the subject, and I am reading from page 425 of 306 U.S., page 576 of 59 S.Ct.: "While one's statements may supply evidence of the intention requisite to establish domicile at a given place of residence, they cannot supply the fact of residence there"; and then continuing the Court says: "and they are of slight weight when they conflict with the fact."

■ This case of State of Texas v. Florida is not, of course, precisely parallel to the case at bar, but I can not ignore the declarations of the Supreme Court of the United States. Neither can I exalt Mr. Gaier's own self-serving declaration of intention to overcome the stubborn facts. The facts are that Mr. Gaier was out of Alaska for 12 years. The facts are that he swore—made affidavit on three successive occasions—that his residence was in California. And we must remember that residence is the precise word used in our law. I have held that residence so used means domicile. Residence for voting purposes, by unbroken current of decisions, means domicile and not just a temporary dwelling place, and that is the rule as laid down in Restatement, Sec. 9e, Page 20.

When we add to that the fact that he himself, perhaps inadvertently, testified that he had resided continuously in Alaska prior to September 13, 1946, only since June, 1945, the fact that he had no home of any kind in Alaska except that he claimed the entire Territory was his home, and all of the other circumstances in the case, it seems to me that the law itself, in spite of his own statements of his own intention, assign to him another residence than that of Alaska—another domicile than that of Alaska.

■ The question now is what the Court ought to do about it. This is an action for forfeiture. It is elementary law that forfeitures are not favored. Many courts have said that the proof, to warrant forfeiture, must be clear and convincing. Other courts in the earlier days have said, on several occasions at least, that a forfeiture must be proved beyond any reasonable doubt.

■ However, the Supreme Court of the United States, in the case of United States v. Regan, 232 U.S. 37, 48, 34 S.Ct. 213, 58 L.Ed. 494, has refuted the theory that proof of forfeiture should be beyond reasonable doubt. It has held in that case, and other cases, that reasonable preponderance of proof is sufficient, and that proof beyond reasonable doubt is not required.

■ In some jurisdictions it has been held that in forfeiture cases the Court has no right to instruct a verdict. The Supreme Court in the year 1909 for the first time, I believe, negatived that theory of the law. We find it in the case of Hepner v. United States, reported in 213 U.S. 103, 29 S.Ct. 474, 53 L.Ed. 720, 27 L.R.A.,N.S., 739, 16 Ann.Cas. 960. In that case the Circuit Court of Appeals asked for instructions and as to whether, where the testimony is undisputed, the Court may instruct a verdict, and the Supreme Court's answer was in the affirmative—that it was the duty of the Court to instruct the verdict where the testimony was undisputed as regards an alleged cause of forfeiture.

Is the testimony undisputed, or substantially so, in this case? I think that it is. The facts are undisputed. The only thing that is in dispute is the intention of the defendant Gaier. He says his intention always was to return to Alaska.

■ ■ Under the authority of the Supreme Court in the case of State of Texas v. Florida, and the other authority to which I have adverted, I believe that declarations of intention can not overcome the results of law or the conclusions of law which follow from the undisputed facts. Those facts have been recited. Those

facts, in the face of Mr. Gaier's declarations, say that he had not resided in Alaska for three years prior to September 13, 1946—that his domicile was not in Alaska for that period. If that be correct, it was the duty of the Court to instruct a verdict.

 Some further challenge has been made to the instructions. The government complains of the failure to give a certain instruction, but that instruction, in other language, was incorporated in the instructions given.

 So, despite the reluctance of every normal person to decree a forfeiture, the ruling must be now that the judgment is set aside and a new trial is granted. It is not possible to enter a judgment of forfeiture notwithstanding the verdict under our practice as I conceive it to be. That might be done under the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, but those rules are not in effect here.