**Elsie B. PERRY**

v.

**Elliott RICHARDSON, Secretary of Health, Education and Welfare.**

**Civ. A. No. 70–3512.**

United States District Court, E. D. Pennsylvania.

Jan. 14, 1972.

David H. Moskowitz, Cornwells Heights, Pa., for plaintiff.

Victor Schwartz, Asst. U. S. Atty., Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

MASTERSON, District Judge.

This is an action under the Social Security Act[1] to review the decision of a hearing examiner[2] holding that the plaintiff, Elsie B. Perry, is not entitled to either widow's insurance benefits or surviving divorced wife's insurance benefits based upon her application filed with the Social Security Administration on February 3, 1969. The hearing examiner predicated denial of widow's insurance benefits upon his finding that the marriage between plaintiff and George L. Perry, the decedent wage-earner, was terminated on December 20, 1939 by a valid divorce.[3] He denied plaintiff's claim for surviving divorced wife's insurance benefits after finding that prior to the New Hampshire divorce, the plaintiff and her husband had not been married for twenty (20) years as required by the Act, 42 U.S.C. § 416(d) (2).[4]

In this appeal, plaintiff asserts that she is entitled to widow's benefits because the finding that she and her husband were validly divorced is not supported by substantial evidence. Alternatively, plaintiff argues that if the evidence supports such a conclusion, then to deny her these Social Security benefits violates her due process rights under the Fifth Amendment. On the other hand, her claim for surviving divorced wife's benefits is virtually abandoned on appeal, probably because the facts do not support such a claim. In addition, it seems inconsistent with her principal assertion that she never received a valid divorce. At any rate, cross-motions for summary judgment are presently before this court.

Without question, this has been a very difficult case to decide. But after careful consideration we have concluded that the absence of a crucial finding of fact by the hearing examiner prevents us from determining whether the plaintiff and her husband were validly divorced in 1939. And since the absence of a valid divorce would obviate the need to decide the constitutional question, we can do no more at this stage of the litigation except issue instructions to the hearing examiner concerning our interpretation of the law which he must apply on remand.

---

1. 42 U.S.C. § 405(g).

2. The hearing examiner's decision was rendered on May 28, 1970 and became the final decision of the Secretary on October 28, 1970 when the Appeals Council denied plaintiff's request for review.

3. Transcript of Administrative Proceedings at 33–34.

4. *Ibid.* at 31. Both parties agree that Elsie and George Perry were married on November 25, 1925, and the examiner's finding of a valid divorce in 1939 means that they were married for only fourteen (14) years.

## I.

With one important exception, the essential facts are not in dispute. Plaintiff married the deceased wage-earner on November 25, 1929, and two children were born of their marriage. During this time, the family resided in New York City. However, sometime in 1935, Mr. Perry left the plaintiff and their children and went to live with his mother, who also lived in New York City. According to Mrs. Perry, her husband then moved to New Hampshire in *1937 or 1938* and continued to live there until he died in 1967.

Official court records from the State of New Hampshire indicate that Mr. Perry filed a divorce libel on August 2, 1939, and stated in paragraph 3 of that libel that he "came to New Hampshire on . . . *January 5, 1938*, and has ever since been continuously domiciled in . . . Concord."[5] Curiously, Mr. Perry later amended his complaint stating "that on account of a stenographic error paragraph 3 should be amended by striking out January 5, 1938 and substituting in place thereof *June 5, 1936*."[6]

The hearing examiner never resolved the sharp dispute concerning the date of Perry's change of domicile. Apparently, he did not consider it necessary for a decision. But under our analysis of the applicable federal and state law (an exposition of which appears below) we respectfully disagree. We consider resolution of the fact crucial.

Having filed a libel for divorce, Mr. Perry was ordered by the New Hampshire Superior Court to serve notice on the plaintiff that she had until the fourth Tuesday in October, 1939 to appear and show cause why the divorce should not be granted. The order specified that notice should be left at the abode of his wife.

Despite the terms of this order, official court records indicate that a copy of the original libel and order were left at the abode of plaintiff's mother.[7] Moreover, instead of informing her daughter of the pending divorce action, plaintiff's mother tore up the summons and said nothing. Consequently Mrs. Perry first became aware of the divorce proceeding through a woman friend of hers sometime in November, 1939.

On November 23, 1939, Mrs. Perry wrote to the court in New Hampshire asking about the case. Of course, her inquiry arrived too late since she had only until the fourth Tuesday in October to appear and voice opposition. Indeed the court's records show that the divorce was granted on that date (the fourth Tuesday in October) on the grounds of abandonment, and that it became final on December 20, 1939. Accordingly, a reply was forwarded to the plaintiff by a Clerk of the New Hampshire Court informing her of these facts.

Plaintiff then consulted a Clerk in the Domestic Relations Court of New York, a Mr. Coffee, who advised her that the New Hampshire divorce had no legal effect in New York State. Thereafter, Mrs. Perry did nothing. She did not appeal from the divorce decree; she took no legal steps in the courts of her domicile; and she did not consult an attorney. She simply relied upon Mr. Coffee's assessment.

After the divorce, Mr. Perry remarried, but that marriage, too, ended in divorce. Although no children were born, Mr. Perry did adopt his second wife's daughter from a previous marriage. Subsequently, Mr. Perry's second wife died, and on October 28, 1967, Mr. Perry also died in Concord, New Hampshire.

---

5. Transcript of Administrative Proceedings at 15.

6. *Ibid.* at 14.

7. According to the plaintiff, service of process was made on her sister-in-law, Anna Bartell, who at that time lived next door to the address recited in the Sheriff's return of service. Record of Administrative Proceedings at 90. However, resolution of this factual dispute is not crucial.

## II.

Plaintiff's claim for widow's or surviving divorced wife's benefits is governed by section 202(e) of the Social Security Act, 42 U.S.C. § 402(e). That section provides in pertinent part:

"(e) (1) The widow (as defined in section 416(c) of this title) * * * of an individual who died a fully insured individual, if such widow or such surviving divorced wife—

"(A) is not married,

"(B) (i) has attained age 60, * * *

"(C) (i) has filed application for widow's insurance, * * *

"(D) (inapplicable)

"(E) is not entitled to old-age insurance benefits or is not entitled to old-age insurance benefits each of which is less than 82½ percent of the primary insurance amount of such deceased individual,

shall be entitled to a widow's insurance benefit * * *."

The dispute in this case revolves solely around whether Mrs. Perry is a "widow" under the Act.

The statute directs us to Section 416(c) of Title 42 for the definition. That section reads in part as follows:

"The term 'widow' means the surviving wife of an individual, but only if

. . .

(5) she was married to him for a period of not less than nine months immediately prior to the day on which he died."

Hence the narrow issue becomes whether Mrs. Perry was still married to the deceased wage-earner within the nine month period prior to his death in 1967. If so, then she is entitled to certain benefits under the Act.

▮ The first sub-question is what law to apply to determine whether she and her husband remained married up until his death. Section 216(h) (1) (A) provides the answer:

"An applicant is the wife, husband, widow, or widower of a fully or currently insured individual for purposes of this subchapter if the courts of the State in which such insured individual is domiciled at the time such applicant files an application, or, if such insured individual is dead, the courts of the State in which he was domiciled at the time of death, or, if such insured individual is or was not so domiciled in any State, the courts of the District of Columbia, would find that such applicant and such insured individual were validly married at the time such applicant files such application or, if such insured individual is dead, at the time he died. If such courts would not find that such applicant and such insured individual were validly married at such time, such applicant shall, nevertheless be deemed to be the wife, husband, widow, or widower, as the case may be, of such insured individual if such applicant would under the laws applied by such courts in determining the devolution of interstate personal property, have the same status with respect to the taking of such property as a wife, husband, widow, or widower of such insured individual."

In short, the Act requires us to determine their status under New Hampshire law.

Since plaintiff never appealed from the New Hampshire divorce decree, it is obvious that she and her husband remained validly divorced as of the date of his death unless: (1) New Hampshire courts *would* have permitted a reexamination of the judgment at that time and (2) the courts *would* have vacated the decree. We must inquire into and answer these two questions because the Act of Congress expressly states that the status which the courts of New Hampshire *would find* as of the date of the insured's death determines plaintiff's rights under the Act.

Turning to New Hampshire law, Section 508:7, Vol. 4A N.H.R.S.A. provides:

"Writs of error may be sued out within three years after judgment, and not

afterward, unless allowed by the court for *sufficient cause,* upon petition and notice." (emphasis added).

Plaintiff asserts that "sufficient cause" exists because her deceased husband lied to the court of New Hampshire when he stated that he was domiciled in New Hampshire for three years before filing the divorce libel.[8] In other words, plaintiff asserts that her husband committed perjury in his petition for divorce.[9]

According to the New Hampshire statutory scheme, jurisdiction of the court depends upon its jurisdiction over the cause of action for divorce as well as over the parties. See 4A N.H.R.S.A. § 458:4. And Section 458:6 provides that:

"Jurisdiction of the cause for divorce exists when it wholly arose or accrued while the plaintiff was domiciled in the state, and not otherwise."

Finally, Section 458:7 provides in part:

"A divorce from the bonds of matrimony shall be decreed in favor of the innocent party for either of the following causes:

\* \* \* \* \* \*

"IX. When either party, without sufficient cause, and without the consent of the other, has abandoned and refused, for two years together, to cohabit with the other."

When the divorce was granted in 1939, however, the statute required abandonment for a period of *three years* instead of two in order to qualify for divorce. See N.H.R.L. C. 339, § 6 (IX). Hence, we conclude that the New Hampshire court's *jurisdiction* in 1939 over a cause of action predicated upon abandonment depended upon Mr. Perry having actually resided in that state for at least three years before filing the di-

vorce libel. (e.g. on or before August 2, 1936). See Liberato v. Liberato, 93 N. H. 219, 38 A.2d 880 (1944); Hopkins v. Hopkins, 35 N.H. 474 (1857). Therefore, the second sub-question becomes whether this allegation constitutes "sufficient cause" to open the judgment.

### III.

■ We begin with the general proposition that "the granting of relief from a divorce decree (after the three year period) [is] governed by general equitable considerations." Bussey v. Bussey, 95 N.H. 349, 64 A.2d 4 (1949). Secondly, we note that under New Hampshire law, fraud constitutes a sufficient ground to open a divorce judgment unless there is an unreasonably long delay in bringing the action and a *status* change has occurred so that damage would accrue to innocent parties, i.e. if the husband remarries and a child is born. See Bussey v. Bussey, supra; Adams v. Adams, 51 N.H. 388 (1872). As the New Hampshire Supreme Court noted in the leading case of Adams v. Adams, supra:

"This doctrine, in regard to impeaching judgments and divorce for fraud, has been applied in numerous cases to decrees in divorce suits and suits for nullity of marriage, and the weight of authority is greatly in favor of such application."

"Upon principle there is no solid ground for any distinction between decrees in divorce suits and other judgments; or if there by (sic) any, it is to be found in the much greater danger of fraud and imposition in divorce cases, as compared with others; thus adding largely to the necessity and importance of preserving the pow-

---

8.  Plaintiff alleges that her husband also committed perjury when he told the court that she had abandoned him. However, unlike the length of domicile in New Hampshire, this fact is not jurisdictional. See 4A N.H.R.S.A. 458:6 and 458:7 (IX). Hence it is a considerably less important consideration for this court in

deciding whether judgment should be opened.

9.  Surprisingly, plaintiff does not claim as sufficient cause, fraud in the service of process which, according to the court's records, was made upon her mother's abode rather than her own.

er to correct or vacate decrees that have been obtained by fraud and imposition."

Whether the alleged perjury constitutes fraud under New Hampshire law presents a very close question. We have found only two cases in which the validity of a divorce decree was challenged on the basis of fraud or perjury in connection with a jurisdictional fact. See Lester v. Lester, 109 N.H. 359, 252 A.2d 429 (1969); Folsom v. Folsom, 55 N.H. 78 (1874). And in both instances, the Court denied the requested relief.

But these cases are distinguishable from the one presently before this Court because both in *Lester* and *Folsom*, the parties moving for reconsideration of the judgment had actual notice of the prior proceedings and had appeared to defend.[10] Consequently, reopening the judgment would only give the losing parties an opportunity to re-litigate issues that already had been decided against them in a fair adversary proceeding.

■ In this case, however, the plaintiff did not appear, nor did she receive adequate or timely notice of the initial proceeding. Moreover, Mr. Perry may have committed fraud upon the court itself. Under these unique circumstances, it is our judgment that a New Hampshire court of equity would consider these contentions as allegations of fraud which would enable it to re-examine the 1939 judgment.

On the other side of the balance, we find nothing that weighs against opening this judgment for fraud. Our first impression was that the 30 year delay in challenging the New Hampshire divorce surely constituted an unreasonably long delay. But a deeper analysis assures us that the delay was not unreasonable in this case.

Back in 1939 when plaintiff received information concerning the ex parte divorce, she inquired about its effect in New York and was correctly informed that it was null and void. See, e.g., Winston v. Winston, 165 N.Y. 553, 59 N.E. 273 (1901). Three years later the United States Supreme Court changed New York law with its decision in Williams v. North Carolina (I), 317 U.S. 287, 63 S.Ct. 207, 87 L.Ed 279 (1942). This case held that under the constitution one State had to give full faith and credit to an ex parte divorce in another, at least to the extent that the divorce affected the *status* of the parties in the rendering state. Since the Social Security Act looks to the *status* of the plaintiff and her husband in New Hampshire, the *Williams* case meant that as of 1942, the ex parte New Hampshire divorce had some impact upon her. Under these circumstances, we regard charging Mrs. Perry with the responsibility to keep abreast of legal changes resulting from decisions of the United States Supreme Court as inequitable. Accordingly, we find her reliance upon New York law and her inaction quite understandable and rational.

Turning to any status change involving innocent parties, we note that Mr. Perry remarried while a resident of New Hampshire. But his second wife has died, so invalidation of the 1939 divorce will have no effect upon her. Moreover, although Mr. Perry adopted his second wife's daughter (who presumably is still living), voiding the divorce will not effect her legitimacy. In sum, we find nothing that would militate against opening the divorce judgment.

The final question in this case must be decided by the hearing examiner. It is, whether he believes Mrs. Perry's assertion that her husband did not move to New Hampshire until 1937 or 1938, and

---

10. Because plaintiff did not receive notice and did not appear, we need not concern ourselves with the dictum in Adams v. Adams, 51 N.H. 388, 400 (1872) that "[t]he court would be slow to reverse a decree of divorce, when the libellee appeared, or had due and actual notice, unless fraud of a serious character is established."

therefore that he committed fraud upon the New Hampshire Court. On the other hand, the examiner may find that the original libel with its crucial amendment should control the answer to this question. We remand this case for such a determination and an application of the law consistent with this Memorandum.